# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
## 3:05-CV-238-MU

| | |
|---|---|
| WILLIAM L. PENDER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| BANK OF AMERICA CORP., et al., ) | |
| ) | |
| Defendants. ) | |

**INTRODUCTION**

THIS MATTER is before the Court on Bank of America ("BoA") Defendants' Motion to Dismiss. For reasons given below, Defendants' Motion is **GRANTED** as to Count I and Count III, and **DENIED** as to Count IV.

**BACKGROUND**

This action arises from the organization and administration of the BAC Plan, and transactions between that plan and the BoA 401(k) Plan ("the 401(k) Plan").

**I. Retirement Plans in General**

This case deals with some of the most complicated aspects of employee pension plans, which warrants a brief overview of how these plans function. The plans at issue are (1) the BAC Plan, which is a type of defined benefit plan called a cash balance plan; and (2) the BoA 401(k) Plan, which is a defined contribution plan. ERISA covers both defined benefit plans and defined contribution plans. Defined benefit plans use a preset formula to provide a specific monthly

1

benefit upon retirement. These plans generally do not allow for an increase in participant benefits beyond the amount guaranteed under the formula. Defined contribution plans, on the other hand, do not guarantee a specific amount upon retirement. Instead employees are given individual accounts to which both the employer and employee can contribute. Under this plan, an employee's retirement benefit is the account balance upon retirement. A 401(k) plan is a species of a defined contribution plan.

In most 401(k) plans, each participant can invest his individual account in investment options provided under the plan. The participant typically bears all the investment risk: if the participant invests poorly, the full account balance can be lost. Although a 401(k) carries this risk, each individual account holder is afforded an important protection: the money in a participant's 401(k) account is his own money, and unlike a defined benefit "account," cannot be squandered by the plan administrators.

Defined benefit plans come in various forms including, cash balance plans–often referred to as a hybrid plan because it has aspects of defined-benefit and defined contribution plans. Like a defined-contribution plan, a cash balance participant has an individual account to which the employer contributes funds. The participant earns interest on that account, or in some cases, the participant can invest the funds in a limited number of financial instruments. But there is a key difference: the participant's account is virtual. In reality, the employer pools the contributed money and invests that pool as it sees fit, while crediting the accounts based on the participant's virtual-investment choices or some preset interest formula. As noted above, because a participant's account is virtual, there is no separate account protection. On the other hand, the employer shelters any investments risk; thus, no matter the poverty of the participant's virtual-

investment choices, the participant's account balance can never drop below the amount contributed by the employer. A cash balance plan must comply with ERISA's standards for defined benefit plans. Upon retirement, the benefit is paid as a lump-sum distribution or an annuity.

## II. The BoA Plans

The BAC Plan is a successor in interest to the NationsBank Pension Plan and the BankAmerica Pension Cash Balance Plan, which merged in 1998. The BAC Plan is a cash balance plan that was originally formulated in 1998 by NationsBank, under the guidance of Defendant PwC. The BAC Plan, and its predecessors, were or are "defined benefit plan[s]" under ERISA §§ 3(2)(A), 3(3), and 3(35) (29 U.S.C. §§ 1002(2)(A), 1002(3), 1002(35)). For the sake of convenience, the separate plans will generally be described as "the Plan" or the "BAC Plan."

Under the BAC Plan, a participant is given a virtual account, which is credited monthly with compensation and investment credits. The compensation credits are based on a percentage of the employee's salary, and the investment credits are based on a limited number of investment options, which are identical to the options available under the Bank's 401(k) plan. Like all cash balance plans, the account balance can never be less than the sum of the opening balance and all compensation credits. The accounts are not however protected from inflation; the actual value of the accounts can decrease.

In addition to the BAC Plan, both NationsBank and Bank of America have or had 401(k) Plans. These 401(k) plans will be referred to as "the 401(k) Plan(s)" or "the 401(k)." Participants in these 401(k)s were given the option of transferring their accounts to the

NationsBank Cash Balance Plan and the Bank of America Pension Plan; and thousands of participants elected to do so. On July 1, 1998, $1.4 billion was transferred from the NationsBank 401(k) Plan to the NationsBank Cash Balance Plan; and on August 4, 2000, $1.3 billion was transferred from the Bank of America 401(k) Plan to the Bank of America Pension Plan. Both Plaintiffs and the IRS claim that these transfers violated ERISA.

III. **The Complaint**

The Third Amended Complaint contains seventeen pages of extensive factual allegations and then asserts four counts as the bases for relief.

    a. *Count I: Unlawful Lump Sum Benefit Calculation*

Count I challenges the Plan's definition of "normal retirement date"[1] and the Plan's subsequent avoidance of the "whipsaw effect" when calculating a participant's lump-sum benefit. Under ERISA, a vested plan participant "has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions." ERISA § 203(a)(2) (29 U.S.C. § 1053(a)(2), 26 U.S.C. § 411(a)(2)). If a defined benefit plan participant seeks his accrued benefit before reaching normal retirement age, the participant can receive a lump-sum payment that is calculated by "projecting the participant's hypothetical account balance to normal retirement age using the plan's interest or investment crediting rate, then converting the projected account balance to a life annuity using reasonable actuarial factors expressed under the terms of the plan," and finally, discounting the value of the annuity back to the time when the

---

[1] The Plan uses the phrase "normal retirement date" to ostensibly denote a "normal retirement age." (Def. Mem., Doc. 222, Ex. 2 at 12.)

4

lump-sum payment is received. (3d Am. Comp., Doc. 145 at ¶ 60 (citing ERISA § 204(c)(3) (29 U.S.C. § 1054(c)(3), 26 U.S.C. § 411(c)(3)); ERISA § 205(g) (29 U.S.C. § 1055(g), 26 § U.S.C. 417(e))). This calculation can lead to a "whipsaw effect" whereby the lump-sum is greater than the current account balance because the projected growth rate under the plan outpaces the discount rate used to express the accrued benefit in today's dollars.

Plaintiffs argue that the Plan unlawfully avoided the whipsaw effect by attempting to set a normal retirement age that coincided with a participant vesting under the Plan—generally occurring before age 65—rather than using age 65, which *should* be the Plan's normal retirement age under ERISA.[2]

b. *Count Two: Age Discrimination*

Count Two alleges age discrimination and has already been dismissed.

c. *Count Three: Violation of Anti-Backloading Rules*

Count Three alleges that the Plan violates ERISA's anti-backloading rules. ERISA requires that "benefits accrue roughly pro rata over the course of an employee's career, rather than being heavily back weighted." (3d Am. Comp., Doc. 145 at ¶ 80 (citing ERISA § 204(b)(1)(A)-(C) (29 U.S.C. § 1054(b)(1)(A)-(C), 26 U.S.C. § 411(b)(1)(A)-(C))). The anti-backloading rules, however, no longer apply once a participant reaches normal retirement age. Plaintiffs argue that the Plan often results in an unlawfully premature retirement age for its participants, and then the Plan provides outsized benefits after reaching retirement age.

---

[2] The Plan defines "normal retirement date" as "the first day of the calendar month following the earlier of (i) the date the Participant attains age sixty-five (65) or (ii) the date the Participant completes sixty (60) months of Vesting Service." (3d Am. Comp., Doc. 145, Ex. 2 at 12.)

5

d. *Count Four: Elimination of Protected Benefit*

Count Four alleges that the transfer of assets from the 401(k) Plans to the BAC Plan, and its precursors, unlawfully eliminated the 401(k) Plans' separate account benefit. ERISA provides that a participant's accrued benefit "may not be decreased by an amendment of the plan except as otherwise specifically provided in ERISA or regulations." (3d Am. Comp., Doc. 145 at ¶ 85 (citing ERISA § 204(g)(1) (29 U.S.C. § 1054(g)(1), 26 U.S.C. § 411(d)(6)(A))). Plaintiffs allege that there are no statues or regulations that allow the separate account benefit to be eliminated. (3d Am. Comp., Doc. 145 at ¶ 85 (citing § 204(g)(1) (29 U.S.C. § 1054(g)(1), 26 U.S.C. § 411(d)(6)(1)); 26 C.F.R. § 1.411(d)-4)). Plaintiffs further allege the 401(k) Plans' fiduciaries breached their fiduciary duty by implementing the transfers. Finally, Plaintiffs allege that the transfers by the Plans fiduciaries were a "prohibited transaction" under ERISA §§ 406(a)(1)(D) and 406(b) (29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)).

IV. **BoA's Motion to Dismiss**

Defendant BoA filed an initial Motion to Dismiss or Strike the Third Amended Complaint. BoA's initial Motion focused on Counts II and IV, but also sought dismissal of all counts for lack of exhaustion or remedy. Defendant BoA's subsequent Motion to Dismiss directly addressed the merits of Counts I and III. The Court has already dismissed Count II and Defendant's exhaustion argument has already been disposed of.

**DISCUSSION**

I. **Legal Standards**

When a court rules on a motion to dismiss for failure to state a claim, all well-pleaded allegations are accepted as true, and reasonable inferences are drawn in favor of the plaintiff.

*Edwards v. Coty of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). A plaintiff must allege facts in his complaint that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Court held that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Twombly*, 550 U.S. at 570). A claim is plausible on its face "when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949 When the allegations in a complaint do not "raise a claim of entitlement to relief," the court will dismiss the complaint. *Twombly*, 550 U.S. at 554-56.

Under Federal Rule of Civil Procedure 12(f), "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

II. **Count I: The Plan Lawfully Calculated Participants'' Lump Sum Distributions**

This Court is faced either with a labyrinthian case—hinging upon countless statutes, regulations, and revenue rulings—or a simple matter of textual, statutory interpretation. Despite Plaintiffs' strong arguments that tap into what might be considered ERISA's maze, the crux of this count is a simple question: under ERISA § 3(24), is "5 years of vesting service" a normal retirement age? The answer is, yes. The Plan—using its valid NRA—lawfully calculated the participants' lump sum distributions.

   a. *5 Years of Vesting Service is a Valid Normal Retirement Age*

Under ERISA, 5 years of vesting service is a valid normal retirement age. ERISA § 3(24) defines "normal retirement age":

>The term "normal retirement age" means the earlier of--
>>**(A)** the time a plan participant attains normal retirement age under the plan, or
>>**(B)** the later of--
>>>**(i)** the time a plan participant attains age 65, or
>>>**(ii)** the 5th anniversary of the time a plan participant commenced participation in the plan.

ERISA § 3(24) (29 U.S.C. § 1002(24), 26 U.S.C. § 411(a)(8)). Bank of America argues that §3(24) allows a plan to set an NRA as it chooses; or to paraphrase § 3(24)(A), a plan's NRA is whatever the plan says it is. Plaintiffs besiege this simple proposition with a multi-prong attack: (1) five years of vesting service is not an "age," (2) five years of vesting service is not the age at which banking employees normally retire, and (3) five years of vesting service is not a valid NRA under Treasury Department regulations and rulings.

First, five years of vesting service is an "age." *Fry v. Exelon*, 571 F.3d 644, 647 (7th Cir. 2009). The meaning of "age" in §3(24) is a matter of first impression in the Fourth Circuit, but this Court is guided by the Seventh Circuit's decision in *Fry v. Exelon*—a case presenting nearly identical facts to the matter at hand.[3] The Exelon plan defined NRA, in part, as "5 years of vesting service." The court in *Fry* held that a participant's age when beginning work, combined with an additional unit of time, is a valid "age." BoA's Plan—like the Exelon plan—defines

---

[3] The Court takes judicial notice of the filings in *Exelon*, which contain the Exelon plan provisions. *See Aguilar v. U.S. Immigration and Customs Enforcement Div. of Dept. of Homeland Sec.,* 510 F.3d 1, 8 n.1 (1st Cir. 2007) (taking judicial notice of records of immigration proceedings); *Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007) (taking judicial notice of records of Missouri court). Exelon's plan set NRA as "the earlier of (a) the date the Participant completes five years of Vesting Service and (b) the later of (i) the Participant's 65th birthday, and (ii) the fifth anniversary of the date the Participant commenced participation in the Plan." By way of comparison, BoA's sets its NRA as "the first day of the calendar month following the earlier of (i) the date the Participants attains age sixty-five (65) or (ii) the date the Participant completes sixty (60) months of Vesting Service." The Court takes judicial notice of the terms of the plan.

8

age, in part, as "5 years of vesting service." This is a valid "age" for the purposes of ERISA §3(24). *See Fry*, 571 F.3d at 647.

Second, NRA is not based on the age upon which employees normally retire. ERISA does not require "a pension plan's retirement age to track the actuarial tables." *Id.* Plaintiffs' argument to the contrary relies on broad proclamations about the policy behind ERISA and the relationships between various ERISA provisions. Plaintiffs cannot, however, cite a statute, regulation, or revenue ruling that tethered NRA to the time that employees normally retire.

Third, "5 years of vesting service" is a valid NRA under Treasury Department regulations and rulings. *Id.* Plaintiffs' main arguments are that 72 Fed. Reg. 28604 retroactively invalidated the Plan's NRA, and that Treasury regulations and revenue rulings required the Plan to specify an age. This Court disagrees.

Treasury Regulation 72 Fed. Reg. 28604 has no retroactive effect and therefore is not applicable here. The regulation provides that "the normal retirement age under a plan be an age that is not earlier than the earliest age that is reasonably representative of the typical retirement age for the industry in which the covered workforce is employed" and it was explicitly made effective as of May 22, 2007. 72 Fed. Reg. 28604, 28605-06; *see also Fry*, 571 F.3d at 648. The relevant period in this matter pre-dates May 22, 2007; 72 Fed. Reg. 28604 cannot apply.

Plaintiffs then argue that the Treasury Department "interpreted the governing statutory provisions as prohibiting a pension plan sponsor from defining 'normal retirement age under a plan' as anything other than ***a specified 'age.'***" (Pl. Resp. Doc. 224 at 14) (citing 26 C.F.R. § 1.411(a)-7(b)(1)(i)) (emphasis in original.) Section 1.411(a)-7(b)(1)(i) does not define "specified age." Plaintiffs assume a specified age must be a number, rather than a method for

9

arriving at a number. Yet neither the regulation *nor the statute* supports this leap. Section §3(24) itself defines NRA in terms of "age," "time," or "anniversary"; nothing in the statute suggests that these three units of time are exhaustive. If § 1.411(a)-7(b)(1)(i) truly does mandate that all NRAs must be a defined, specific number, the regulation stands in stark contradistinction to the statute—a result that *Chevron* could not bear. *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) (holding that when Congress's statutory intent is clear, a court shall not look to regulations; however, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.")

Plaintiffs also turn to IRS Revenue Ruling 78-120, which uses the "*specified age*" language in 26 C.F.R. § 1.411(a)-7(b)(1)(i). "Although revenue rulings are not binding upon courts," Plaintiffs argument will be addressed. *See Disabled Am. Veterans v. Commissioner*, 942 F.2d 309, 317 (6th Cir. 1991). The gloss added by this revenue ruling does not favor the Plaintiff; quite the opposite, the ruling states that "a plan may specify any age that is less than 65 as the normal retirement age." Rev. Rul. 78-120. Plaintiffs argue that 78-120 should be limited to its facts, which do not present a plan using an NRA of 5 years of vesting service. Plaintiffs further contend that if 78-120 truly allowed a plan to specify *any* age as an NRA, 72 Fed. Reg. 28604 would have needed to explicitly revoke 78-120 rather than mention 78-120 as background. This is not a reasonable assertion. The preamble to the 2007 amendments briefly referenced 78-120 in a passage that could best summed up as "that was then, this is now." *See* 72 Fed. Reg. 28604 ("Rev. Rul. 71-147 was modified by Rev. Rul. 78-120 (1978-1 CB 117). . . . Under Rev. Rul. 78-120, for purposes of section 411, a pension plan is permitted to have a

10

normal retirement age lower than age 65, regardless of the age at which employees customarily retire in the particular company or industry.").

Finally, a number of courts have recognized that an NRA can be an age less than 65. *See Janowski v. Int'l Bhd of Teamsters, Local No. 710 Pension Fund*, 673 F.2d 931, 937 (7th Cir. 1982) (noting that "the statute authorized any normal retirement age," subject to a ceiling of age 65), *vacated on other grounds*, 463 U.S. 1222 (1983); *Geib v. N.Y. State Teamsters Conference Pension and Ret. Fund*, 758 F.2d 973, 976 (3d Cir. 1985) ("The statute clearly permits the use of a normal retirement age less than 65.").

b. ***The Plan's NRA is the Earlier of the Date a Participant Turns 65 or Attains 5 Years of Vesting Service***

Section § 2.1(c)(35) of the Plan sets "Normal Retirement Date" as the earlier of the date a participant turns 65 or attains 5 years of vesting service; this is indeed the Plan's NRA. Plaintiffs argue that the Plan failed to set an NRA because (1) section § 2.1(c)(35) of the Plan defines a "normal retirement date" rather than an "age"; (2) the Plan would violate numerous statutes and regulations if 5 years of vesting service is used as an NRA; and (3) BoA's Summary Plan Description ("SPD") failed to inform participants that the NRA was based, in part, on 5 years of vesting service.

First, although the Plan uses the term "normal retirement date" rather than "age," both this Court and Plaintiffs clearly understand that BoA defined a "normal retirement age." In *Adams v. La.-Pac. Corp.*, 177 Fed. Appx. 335 (4th Cir. 2006), the court of appeals recognized that a "normal retirement date" is functionally equivalent to a "normal retirement age," *see id.* at 338-39. Plaintiffs merely identify a distinction without a difference, and this case will not hinge on magic words.

Second, Plaintiffs argue the Plan's NRA puts the Plan on a collision course with ERISA § 206(a), 26 U.S.C. § 401(a)(14), and 29 C.F.R. § 2530.203-3, which might cause the Plan to lose its tax exempt status. Plaintiffs assume that BoA must have intended an NRA of 65 lest the Plan invite drastic consequences. BoA might very well compromise its tax status by using 5 years of vesting service as it NRA, but that is an issue for another court and another plaintiff at another time.

Third, Plaintiffs' SPD argument fails because they have not alleged actual prejudice. In the Fourth Circuit, "'if there [is] a conflict between the complexities of the plan's language and the simple language of the [SPD], the latter [will] control if the participant relied on the SPD or was prejudiced by it.'" *Martin v. Blue Cross & Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1204 (4th Cir. 1997) (quoting *Hendricks v. Cent. Reserve Life Ins. Co.,* 39 F.3d 507, 511 (4th Cir.1994)) *abrogated on other grounds by* Williams v. Metropolitan Life Ins. Co., No. 09-1025, 09-1568, --- F.3d ----, 2010 WL 2599676 (4th Cir. Jun 30, 2010). Here, Plaintiffs fail to allege they read the SPD and subsequently relied on it to their prejudice.

   c. *The Plan Accurately Calculates Participants' Lump Sum Distributions*

The Plan accurately calculates its participants' lump sum distributions. Plaintiffs, however, argue the Plan erroneously calculated distributions because they failed to include (1) a participant's right to interest credits that could have been earned until age 65, and (2) "the value of [a participant's] right to leave his account balance in the Plan even after attaining normal retirement age and continue to receive investment credits indefinitely." (Am. Comp. ¶ 61.) Plaintiffs, during oral arguments, also put forth an incipient theory based on *Contilli v. Local 705 Intern. Broth. of Teamsters Pension Fund*, 559 F.3d 720 (7th Cir. 2009): they appear to argue

their benefits were forfeited because the Plan failed to actuarially account for post-NRA periods when participants were not receiving benefit payments.

First, a participant's lump sum distribution need only include pre-NRA interest credits—which the Plan does. *Fry*, 571 F.3d at 646.

Second, a participant's option to keep his money in a cash balance account beyond NRA is not a "benefit" that must be actuarially accounted for when calculating a lump sum benefit. *Laurent v. PricewaterhouseCoopers LLP*, 448 F. Supp. 2d 537, 549-50 (S.D.N.Y. 2006).

Finally, BoA did not breach ERISA's anti-forfeiture rules by failing to actuarially adjust participants' benefits to account for post-NRA periods when benefits were not being paid. Regardless of whether this is a new claim that has not been sufficiently pleaded, Plaintiffs misapprehend *Contilli*—the case on which they rely. In *Contilli*, the plaintiff reached his normal retirement age (65) and then sought retirement payments *after* working two more years; those payments were made several months after he stopped working and the plan failed to actuarially adjust the plaintiffs benefits to account for that gap *after he stopped working*. *Contilli*, 559 F.3d at 721-22. This resulted in a forfeiture. *Id.* at 722. Here, Plan participants continue to earn compensation and/or investment credits after reaching NRA; this provided for the actuarial adjustments that *Contilli* would seem to require.

III. **Count III: The Plan Does not Violate ERISA's Anti-backloading Provisions**

Plaintiffs concede that Count III fails if the Plan's NRA is invalid; this contingency has come to pass. (Hr'g Tr. Doc. 238 at 3 ("On count three, however, I did want to say that if the normal retirement age is valid on count three, we—as far as I'm aware—we do not have a theory

13

on count three that withstands their theory of NRA validity."); *Pothier, et al. v. Bank of America Corp., et al.*, No. 04-458-GPM, Doc. 100 at 11 n.15.)

IV. **Count IV: Plaintiffs State a Claim for Elimination of Protected Benefits**

In Count Four, Plaintiffs state a claim when they allege (1) BoA unlawfully eliminated ("cutback") the separate account benefit afforded by the 401(k) Plans by transferring approximately $3 billion in assets from the 401(k) Plan to the BAC Plan, (2) BoA breached its fiduciary duties by failing to ignore the Plan amendments that effected the transfer, and (3) the asset transfers were "prohibited transactions in which the Plans' fiduciaries and the Bank unlawfully participated." (Pl. Mem. Doc. 157 at 23). Before discussing the validity of Plaintiffs' claim, the Court notes that the IRS found that the 401(k) transfers violated ERISA. (Def. Mem., Doc. 157, Ex. 1 at 2.) The IRS's actions support the Plaintiffs' claims under Count Four.

Turning to Plaintiffs' first argument, ERISA, as implemented by Treasury Regulation § 1.411(d)-4, Q&A-3(a)(2), provides that the 401(k) separate account feature is a protected benefit that cannot be eliminated. ERISA § 204(g)(1) (29 U.S.C. § 1054(g)(1), 26 U.S.C. § 411(d)(6)(A)); 26 C.F.R. § 1.411(d)-4, Q&A-3(a)(2). Here, BoA and the Plan fiduciaries implemented a $3 billion asset transfer from the 401(k) Plan to the BAC Plan whereby the Plans' assets were commingled. As the IRS has found, participants thus lost their separate accounts—a protected benefit under ERISA.

Second, ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants" and in a manner consistent with ERISA's provisions. ERISA §§ 404(a)(1)(A), (a)(1)(B) and (a)(1)(D) (29 U.S.C. §§ 1104(a)(1)(A), (a)(1)(B), and (a)(1)(D).

A fiduciary has a duty to ignore a plan term that is inconsistent with ERISA if implementing that term is contrary to a participant's interest. ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(A)(D)); *Cement & Concrete Workers Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp.2d 175, 185 (E.D.N.Y. 2005) ("Of course, a trustee may not hide behind the terms of the trust documents to protect himself from liability where there is an 'inherent inconsistency' between a provision in a plan document and a fiduciary duty expressed elsewhere in ERISA.'" (quoting *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1242 (2d Cir. 1989)); accord *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 ("[T]rust documents cannot excuse trustees from their duties under ERISA."); *Agway, Inc. Emps.' 401(k) Thrift Inv. Plan v. Magnuson,* 2006 U.S. Dist. LEXIS 74670 (N.D.N.Y. July 13, 2006) ("Nothing in ERISA, including section 404(a)(1)(D), requires blind compliance with plan terms which would require a fiduciary to engage in imprudent conduct.").

Here, Plaintiffs state a valid claim by alleging that Plan fiduciaries failed to ignore the terms of the Plans that effected an unlawful cutback. It is also alleged that the Plans' fiduciaries "had a duty to communicate with the Trustee and other Defendant fiduciaries honestly, and to otherwise act with the best interests of participants in mind, which they failed to do." The Plans' fiduciaries thereby knowingly participated in, enabled, and/or failed to make reasonable efforts to remedy the Trustee's and other Defendant fiduciaries' breach (the asset transfer). Again, the IRS's findings buttress this claim.

BoA argues that because the 401(k) transfers were made pursuant to amendments to the Plan, they are not fiduciary acts, but "settlor" acts that cannot form the basis of a breach of fiduciary duty claim. As BoA states, "the Supreme Court and the Fourth Circuit have

15

consistently held that the design, amendment, and termination of a benefit plan are 'settlor' functions that cannot form the basis of a breach of fiduciary duty claim." (Def. Mem. Doc 151 at 15 (citing *Hughes Aircraft*, 525 U.S. 432, 444-45 (1999); *Lockheed Corp. v. Spink*, 518 U.S. 882, 890 (1996)). Plaintiffs do not, however, take issue with the acts of designing and amending the Plans—Defendants' implementation of the transfers is the seat of potential liability.

BoA also counters that a fiduciary does not breach his duty by implementing Plan provisions that violate ERISA. BoA stretches *Ulico* beyond its scope when making this argument. *Ulico* simply states that a Plan fiduciary does not *necessarily* breach his duty by complying with a plan provision that he knows violates ERISA. *Ulico*, 387 F. Supp. 2d at 185. Here, however, the Plans' fiduciaries might have breached their duties because implementing the transfers deprived participants of an important protection under ERISA—the separate account feature.

Third, Plaintiffs state a valid claim that BoA—as Plan fiduciary—and other Plan fiduciaries engaged in a "prohibited transaction" when assets were transferred from the 401(k) Plans to the BAC Plan. Under ERISA §§ 406(a)(1)(D) and 406(b) (29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)), a plan fiduciary engages in a "prohibited transaction" when, at the expense of plan participants, he uses 401(k) assets for his own or a third party's gain. Here, BoA commingled the 401(k) assets with the BAC Plan assets and then invested those assets with the hope of offsetting the Bank's obligation to fund the BAC Plan. In turn, when the 401(k) assets were transferred and commingled, 401(k) Plan participants lost their separate account protections. The Plan fiduciaries thus allowed 401(k) Plan assets to be used for the Bank's benefit and the expense of the 401(k) participants. Plaintiffs support their argument with ERISA's language and

not with case law. Given the relatively novel nature of the Plans and the transfers, the absence of case law is not surprising. Based on the language of ERISA §§ 406(a)(1)(D) and 406(b), Plaintiffs' claim is at least plausible on its face.

V. **Defendant's Arguments Concerning Remedies Will Not Be Heard at This Time**

BoA argues that portions of the remedies section of the Third Amended Complaint should be dismissed or stricken. The Court will not address remedies at this point.

**CONCLUSION**

Defendants' Motion to Dismiss is hereby **GRANTED** as to Count I and Count III, and **DENIED** as to Count IV. **SO ORDERED**.

Signed: August 25, 2010

Graham C. Mullen
United States District Judge