IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05-cv-00238-GCM

| | |
|---|---|
| William L. Pender, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) ORDER |
| Bank of America Corp. et al., | ) |
| Defendants. | ) |

THIS MATTER comes before the Court on Defendant Bank of America's ("BoA") Motion for Summary Judgment [Doc. No. 293] and Plaintiffs' Cross Motion for Partial Summary Judgment [Doc. No. 295]. For the reasons set forth below, Defendant's Motion is GRANTED and Plaintiffs' Motion is DENIED.

**I. BACKGROUND**

**A.     The Plaintiffs and The BoA Plans**

Plaintiff David McCorkle worked for NationsBank which later merged with BankAmerica to form BoA. Plaintiff William Pender works for BoA. Pender is a participant in the Bank of America cash balance defined benefit pension plan ("the BAC plan"). [Fourth Amended Complaint ("FAC") at ¶9, Doc. No. 259]. McCorkle is as well. [Id. at ¶10]. They represent similarly situated NationsBank and BoA employees who also elected to transfer their 401(K) plan assets into BoA's BAC plan.

Plaintiffs and those similarly situated were participants in two retirement plans originally offered by NationsBank: (1) a defined contribution 401(k) plan ("the 401(k) plan"), and (2) a defined benefit pension plan ("the pension plan"). NationsBank amended the pension plan to

1

adopt a "cash balance formula" and to allow 401(k) plan participants to transfer their 401(k) assets into the cash balance plan effective July 1, 1998. [FAC ¶22]. This cash balance amendment essentially created a new pension plan. The details of this new plan are discussed below. When NationsBank later merged with BankAmerica to form BoA on September 30, 1998, this new pension plan remained in place, as did the 401(k) plan. This cash balance defined benefit pension plan—whether referenced during the time of NationsBank or BoA—is therefore referred to as the BAC plan. Though some mention of the original NationsBank pension plan follows, the material facts almost entirely concern two BoA retirement plans: (1) the 401(k) plan and (2) the BAC plan. Collectively, these are "the BoA plans."

Before the creation of the BAC plan, Plaintiffs' 401(k) assets remained separate from the assets held in NationsBank's pension plan trust. In accordance with the manner in which defined contribution plans generally work, the 401(k) plan maintained individual accounts for each plan participant. [See Doc. No. 295-9 §2.1(c)(1)]. NationsBank and participants could contribute a defined amount to these accounts. Participants could then invest their individual accounts in investment options provided under the plan. Participants' accounts would be adjusted from time to time to reflect their allocable share, if any, of investment gains and losses of the trusts in which their 401(k) assets were held. [See id. §6.1(a)]. By having a separate 401(k) account, a participant retained control over how his 401(k) assets were to be invested and was protected from the investment errors of a trustee. But, this separate account feature also exposed a participant to the risk of investment loss.

NationsBank amended the 401(k) plan, effective June 30, 1998, to authorize participants to transfer their 401(k) assets into the BAC plan's general trust per the July 1, 1998 amendment to the pension plan [Doc. No. 295-10]. This transfer was an all or nothing option. [Doc. No. 294-

8 at 6]. On five separate occasions between July 1, 1998 and January 1, 2001, the 401(k) plan's trustee transferred approximately $3 billion of participants' 401(k) assets into the BAC plan trust. [FAC at ¶3]. When a participant elected to transfer his 401(k) assets into the BAC plan trust, Defendant BoA caused four things to happen. First, BoA created a transferred savings account ("TSA") for each participant who elected to transfer his 401(k) assets into the BAC plan trust. The initial balance of each participant's TSA was equal to the amount transferred from his 401(k) plan. [Doc. No. 295-6 §5.1(b)]. Second, BoA commingled participants' 401(k) assets with the assets of the BAC plan's general trust. [FAC at ¶49]. The commingled assets were then invested in investment options selected by the BAC plan trustee. [Id. at ¶38]. Third, BoA periodically credited each participant's TSA with investment credits. [Id. at ¶54]. Fourth, BoA guaranteed any money the participants transferred into the BAC plan against investment loss. [Id. at ¶55].

However, when it came to crediting participants' TSAs, Defendant BoA did not credit each TSA with the investment returns that participants' 401(k) assets were *actually* generating in the BAC plan's general trust. Rather, BoA credited each TSA with *hypothetical* investment returns. [FAC at ¶38]. The hypothetical investment returns were based on the performance of whatever options into which a BAC plan participant chose to invest his 401(k) assets. [Id.]. These returns were hypothetical because, per the BAC plan, a participant's 401(k) assets were actually never invested in the options a participant selected. They, along with other BAC assets, were actually invested in whatever options the BAC plan trustee selected. [Id.]. The performance of investment options selected by BAC participants was only used to determine the investment

3

return to be credited to their TSAs.[1] [Id.]. BAC plan earnings would then be used to fund participants' benefit payments. [See id.].

**B.    Disclosed Transfer Information**

In connection with the first transfer on July 1, 1998, Plaintiffs and other NationsBank employee-participants received communications describing the upcoming plan changes.[2] These communications came in the form of a series of NationsBank publications, titled "*It's Time*" and also in a NationsBank booklet, titled "*Keys to Your Future.*" After receiving these communications, Plaintiffs voluntarily chose to transfer their 401(k) plan assets into the BAC Plan.

*It's Time* Issue 2 of December 1997 described features of the BAC plan and the transfer option. It explained at least four features. First, participants would receive statements of their individual BAC plan accounts via TSAs. [Doc. No. 294-7 at 5]. Second, participants would select investment options that tracked investments offered in the 401(k) plan. Their TSAs would receive investment credits based on the returns of options they selected. [Id. at 6]. Third, participants' TSAs only existed on paper and the assets of the BAC plan would actually be held in a trust which NationsBank would invest. [Id. at 4]. Proceeds from the investment of the BAC plan would then be used to fund participants' benefit payments. [Id.]. Fourth, any excess proceeds over what was credited to participants would be retained by the BAC trust and used to decrease plan costs, saving money for NationsBank. [Id.].

---

[1] For example, say a participant had $100,000 in his 401(k) Plan. He selected to invest his 401(k) Plan in option X. Then, he transferred his 401(k) assets into the BAC plan, giving him an initial TSA balance of $100,000. While his $100,000 was actually commingled and invested in option Y by the BAC trustee, option X was generating a 5% return. Meanwhile option Y was generating a 10% return. The participant's TSA would be credited with $5,000, not $10,000.
[2] Plaintiffs dispute whether BAC participants whose accounts were transferred in the four other transfers between 1998 and 2001 received these communications. Because this Court does not rely on these communications to reach its holding, this dispute is of no effect.

4

*It's Time* Issue 5 of March 1998 further explained the features of the BAC plan and the transfer option. It explained three perks for participants and NationsBank that would result from the transfer. First, unlike the operation of the 401(k) plan, money transferred from the 401(k) plan into the BAC plan would be guaranteed against investment loss. [Doc. No. 294-8 at 3]. Second, participants would also be able to get tax free loans from the BAC plan for any reason. [Id.]. Third, NationsBank would save money by keeping any excess investment proceeds over what was credited to participants. This excess would provide the monetary basis for the investment guarantee and tax-free loan perks for participants. [Id.]. *It's Time* Issue 6 reiterated these perks. [See Doc. No. 294-9].

*Keys to Your Future*, which was circulated before the July 1, 1998 transfer, made similar disclosures. It repeated the perks of the investment guarantee, tax-free loans, and savings for NationsBank. Further, it stated, "Remember: your account is a record-keeping account. NationsBank will actually invest the plan assets according to the plan's investment strategy. You receive investment credits based on the performance of the investment options *you* select." [Doc. No. 294-10 at DLM000493 (emphasis in original)].

**C.**     **IRS Involvement**

Following the appearance of a *Wall Street Journal* article covering the BAC transfers, the IRS opened its audit of BoA's retirement plans on or about July 20, 2000. During the audit, BoA and the IRS engaged in a series of correspondences regarding the Internal Revenue Code's ("IRC") requirement of a separate account feature for any employee 401(k) plan assets that are transferred into a defined benefit plan such as the BAC plan. In these correspondences, BoA's position was that the separate account feature was not violated if a defined benefit plan such as

the BAC plan provided a benefit not less than the transferred 401(k) plan benefits, adjusted at a 'going rate' for periods after the transfer. [Doc. No. 295-29 at 1-2].

On December 9, 2005, the IRS issued its Liability Technical Advice Memorandum ("TAM"), which concluded that the transfers of participants' 401(k) assets into the BAC plan resulted in a loss of the separate account feature required for defined contribution plans. [Doc. No. 295-5 at 26]. The IRS reasoned that, "to preserve the separate account feature, the separate defined contribution account must be determined by the investment experience of the contributions made on the participant's behalf." [Doc. No. 295-5 at 25]. Thus, according to the IRS, the BAC plan's hypothetical investment credits failed to preserve the separate account feature.

In *ex parte* settlement negotiations concerning this alleged violation[3] the IRS submitted that, in order to restore the separate account feature, BoA should pay participants the greater of (a) the original TSA amount plus BAC trust earnings (actual earnings) or (b) the hypothetical TSA account balance. [Doc. No. 295-12 at 1]. BoA disagreed with this restoration method and instead proposed its "Rescission Plus" method. [See Doc. No. 295-35 at 4]. By this method: (1) the hypothetical balance of participants' TSAs would be transferred out of the BAC trust and into individual 401(k) plan accounts; (2) the balance of the TSA would be maintained as a sub-account within participants' 401(k) plan accounts; (3) the restored funds would actually be invested at the direction of the individual participants; (4) the balance guarantee in the BAC plan would be maintained to ensure that no participant received less than his initial TSA balance in the course of shifting the 401(k) assets out of the BAC trust, into individual accounts; and (5) a minimum rate of return would be guaranteed to BAC plan participants. [Doc. No. 295-7 at 7-10]. More about this guaranteed rate of return follows below.

---

[3] BoA disputes whether the circumstances recounted amounted to an actual violation.

Within a few days following a July 20, 2007 settlement meeting between BoA and the IRS, the parties reached an agreement to settle the ongoing audit. The determination letters the IRS issued in connection with the Closing Agreement stated that they related only to the status of the BoA plans under the IRC and did not amount to a determination regarding the application of other federal statutes. [Doc. No. 295-8]. Under the settlement, BoA paid 10 million dollars to the U.S. Treasury and spent approximately 10 million dollars applying its Rescission Plus method to shift participants' 401(k) assets out of the commingled trust, back into separate accounts. [Doc. No. 295-7 at 3, 9].

D.  **BAC Benefit Recalculations**

Per the Closing Agreement with the IRS, BoA established a new special purpose defined contribution plan. Effective April 15, 2009, for participants who still had TSA accounts under the BAC plan, BoA implemented steps to transfer BAC participants' TSA account balances out of the BAC plan, into individual accounts in the name of each participant. [Doc. No. 295-7 at 7-10]. The transferred TSA balance reflected a participant's originally transferred 401(k) balance plus hypothetical investment credits to date. After this transfer from the BAC plan occurred, a participant's TSA assets would actually be invested in the options a participant chose and would receive investment credits based on the actual performance of those options. [Id.].

In addition to delivering on its guarantee against investment loss under the BAC plan, BoA amended its BAC plan to guarantee a minimum rate of return on transferred 401(k) assets that were invested in the BAC plan. For participants who had not received their benefit payment before January 1, 2007, this minimum rate of return was 11.6%. According to BoA, 11.6% represented the difference between (a) the rate of return BoA earned by investing participants'

401(k) assets in the BAC trust between July 1, 1998 and December 31, 2006 and (b) the average hypothetical return earned by participants during the same period. [Id. at 8].

The benefit calculation method for participants who received their benefit payment before January 1, 2007 was different. The guarantee against investment loss remained. But the guaranteed minimum rate of return was not 11.6%. Rather, the minimum rate of return for such a participant was calculated by (a) taking the actual return the transferred BAC assets made between the participant's original 401(k) transfer date and the date on which the participant received payment from the BAC plan and (b) comparing that actual return to the average hypothetical return earned by all participants over the same period. The participant's guaranteed minimum rate of return was equal to the positive difference, if any, between (a) the actual rate of return on participants' transferred 401(k) assets and (b) the average hypothetical rate of return for the period when the participant's 401(k) assets were invested in the BAC trust. [Id. at 8].

## II. PROCEDURAL HISTORY

Plaintiffs filed their original complaint against Defendant BoA in 2004 in the U.S. District Court for the Southern District of Illinois. In 2005, the action was transferred to the Western District of North Carolina, where Plaintiffs eventually filed their Third Amended Complaint in 2005. [Doc. No. 145]. The Third Amended Complaint contained four counts against BoA. Count two was dismissed in 2010. Counts one and three were later dismissed in the same year. [Doc. No. 240]. The dismissal of counts one and three became the subject of an appeal to the Fourth Circuit in 2011. [Doc. No. 283]. The Fourth Circuit affirmed this Court's ruling on both counts in a published opinion in 2012. McCorkle v. Bank of America Corp., 688 F.3d 164 (4th Cir. 2012).

On February 3, 2011, Plaintiffs filed their FAC. [Doc. No. 259]. Because no new counts were added, only the claims in count four remain to be decided. Each of these claims is quoted in the discussion below. Defendant BoA has moved for summary judgment on all remaining claims in count four. Plaintiffs responded with a Cross Motion for Partial Summary Judgment seeking a declaration that Defendant is liable to disgorge the money it earned on Plaintiffs' commingled 401(k) assets. [Doc. No. 295-1 at 1-2].

In its Motion for Summary Judgment, Defendant contends that, assuming a violation occurred, it restored ERISA and the IRC's required separate account feature, mooting Plaintiffs' claim for loss of the same. [Doc. No. 294 at 9-10]. Defendant then argues that Plaintiffs have no further injury to be redressed with equitable monetary relief because Plaintiffs' only possible injury under count four was the temporary loss of the separate account feature. Defendant concludes that Plaintiffs lack Article III standing to seek equitable monetary relief since Defendant restored any alleged loss of the separate account feature, leaving Plaintiffs with no redressable injury. Defendant also argues that Plaintiffs waived any right to equitable relief when they authorized the BAC plan transfers.

In response, Plaintiffs argue that they have Article III standing. Particularly, Plaintiffs argue that many class members still suffer a redressable injury because they have not received their allocable share of the money Defendant earned on their 401(k) assets while they were commingled in the BAC plan trust ("the spread"). [Doc. No. 308 at 6-8]. Also, Plaintiffs argue that the authorization defense raised by Defendant does not apply because the separate account feature is a non-waivable benefit. [Id. at 8, n.7].

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 248 (1986). The mere existence of a scintilla of evidence in support of the nonmovant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV. DISCUSSION

**A. Any claim Plaintiffs may have for loss of the separate account feature was mooted by Defendant's restoration of the same pursuant to its 2009 Closing Agreement with the IRS.**

In its Motion for Summary Judgment, Defendant contends that, assuming a loss of the separate account feature occurred, the feature was restored, mooting Plaintiffs' claim for loss of the same. Plaintiffs argue that many class members still suffer a redressable injury because they have not received their allocable share of the spread Defendant earned on their 401(k) assets. The parties do not dispute the features of the BoA Plans or the steps Defendant took to restore the separate account feature pursuant to its Closing Agreement with the IRS. Rather, the dispute centers on the legal question of whether any claim Plaintiffs may have for loss of the separate account feature has been mooted.

The Constitution limits the jurisdiction of federal courts to actual "Cases" or "Controversies." *See* U.S. Const. art. III, § 2 cl. 1. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). "Federal courts should determine whether a live case or controversy continues to exist at the outset since mootness goes to the heart of the Article III jurisdiction of the courts." *Suarez Corp. Ind. v. McGraw*, 125 F.3d 222, 228 (4th Cir. 1997). When circumstances change from the time the suit is filed, so that a court can no longer serve the intended harm-preventing function or has no effective relief to offer, the controversy is no longer live and must be dismissed as moot. *See Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002) (quoting *County Motors v. General Motors Corp.*, 278 F.3d 40, 43 (1st Cir.2002)).

A defendant's cessation of the challenged conduct may render a claim moot if two requirements are met. First, "subsequent events [must] make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). Second, it is required that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation". *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).

Here, Plaintiffs' claims under count four of the FAC concern Defendant's conduct in allegedly violating their right to a separate account feature for their 401(k) assets under ERISA and the IRC. ERISA § 204(g)(1) (29 U.S.C. § 1054(g)(1)) and IRC § 411(d)(6)(A) both provide that the accrued benefit of a participant in a retirement plan may not be decreased by an amendment of the plan, other than an amendment described in U.S.C. §1082(d)(2) or §1441.

Neither of these amendment exceptions applies here. Building on the above laws, 26 C.F.R. § 1.411(d)-4, Q&A-3(a)(2), which implements IRC § 411(d)(6)(A), provides that the separate account feature of an employee's defined contribution plan is a protected benefit under the IRC that may not be eliminated except as provided under IRC § 411(d)(6). IRC § 411(d)(6) also does not provide an applicable exception that allows the separate account feature to be eliminated.

In their first claim under count four of the FAC, Plaintiffs claim that Defendant BoA deprived them of this protected benefit when it transferred their 401(k) assets into the commingled BAC Plan:

> 106. Pursuant to plan amendment(s) and the implementation of the amendment(s), the Bank and/or Bank fiduciaries eliminated or decreased the separate account of every 401(k) Plan participant whose individual account assets were removed in whole or in part from one or more of the above-referenced 401(k) plans and deposited into the Pension Plan's commingled trust fund. Either when participants' accounts were removed in whole or in part and/or when their account assets were deposited in the Pension Plan trust and commingled with other Pension Plan general account assets, the separate account feature was eliminated or decreased, in violation of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1), IRC § 411(d)(6)(1) [sic], and Treas. Reg. § 1.411(d)-4,Q&A-3(a)(2). [FAC].

As noted above, Defendant contends that it did not violate ERISA and the IRC's separate account feature requirement. However, to determine whether Plaintiffs' claim for loss of the separate account feature is mooted, this Court does not need to answer whether or not Defendant actually committed this violation. Rather, the Court only needs to assume the Defendant committed such a violation and determine whether Defendant's subsequent conduct would have mooted such a violation. Accordingly, the following mootness analysis incorporates this assumption for the sake of argument only and makes no holding regarding whether Defendant's actions constituted a violation.

Assuming this separate account feature violation occurred, Defendant restored the loss of the separate account feature pursuant to its Closing Agreement with the IRS in 2009. Plaintiffs

argue that they have not been made whole because this restoration only functioned prospectively, failing to give Plaintiffs the spread Defendant earned on their 401(k) assets while the separate account feature was absent. [Doc. No. 308 at 6]. Plaintiffs first appeal to the IRS-issued TAM as a legal basis for their argument that they are entitled to such spread in order to be made whole. Plaintiffs boldly tell this Court, "[the TAM held] that '[t]he spread, if any, between actual gains and losses and the hypothetical gains and losses' belongs to participants, not the bank." [Doc. No. 295-1 at ¶34 (quoting Doc. No. 295-5 at 25)]. But, page 25 of the TAM has no such holding by the IRS. Rather, this citation is from a paragraph in which the IRS is simply explaining how the BAC plan operated—not remedies owed to Plaintiffs. The only other basis Plaintiffs cite that allegedly entitles them to the spread Defendant earned on their 401(k) assets is a smattering of IRS communications that occurred during the negotiation of the Closing Agreement. FRE 408 provides,

> (a) Prohibited Uses. Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> (1) …
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Since this is not a criminal case, Plaintiffs cannot use these IRS negotiation communications to prove the validity of their claim that they are entitled to the spread Defendant BoA earned on their 401(k) assets. Plaintiffs therefore fail to identify any legal basis entitling them to the spread earned by Defendant.

Contrary to Plaintiffs' argument, there is no ERISA or IRC provision entitling them to the spread Defendant BoA earned on their 401(k) assets. Further, the IRS's view of the matter confirms that Defendant fully restored the separate account feature. "Where an agency has made

13

an interpretation of its own regulation, that interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation." *D.L. ex. rel. K.L. v. Baltimore Bd. Of School Com'rs*, 706 F.3d 256, 159-60 (4th Cir. 2013) (internal citations omitted). Here, pursuant to the Closing Agreement, the IRS "treat[ed] the Defendant's TSA plan transfer steps as restoring any separate account feature to each Transferred Savings Account that was in the 401(k) Plan immediately prior to the transfers…" [Doc. No. 259-3 at 4, 7-9]. Since 26 C.F.R. § 1.411(d)-4, Q&A-3(a)(2)'s implementation of IRC § 411(d)(6) is the legal basis for Plaintiffs' claim for loss of the separate account feature, the IRS's view of the restoration of the separate account feature is an interpretation of its own regulations. And, as part of the Closing Agreement, this statement represents the final position of the IRS regarding the restoration of the separate account feature. Accordingly, this IRS interpretation of whether Defendant has restored the separate account feature is controlling. Therefore, contrary to Plaintiffs' tenuous argument, Defendant has ceased any violation of ERISA and the IRC's separate account feature requirements, and restored participants' accounts to their pre-transfer state. Assuming the violation occurred, Defendant's restoration of this feature completely and irrevocably eradicated the effects of the violation because, for the reasons discussed below, Plaintiffs have not experienced any injuries aside from the temporary loss of the separate account feature.

Additionally, two events following Defendant's violation of ERISA and the IRC's separate account feature requirement make it absolutely clear that Defendant's violation of the separate account feature requirement cannot reasonably be expected to recur. First, Defendant has paid the IRS 10 million dollars pursuant to the Closing Agreement concerning the violation. [Doc. No. 259-3 at 3]. Second, Defendant spent approximately 10 million additional dollars moving Plaintiffs 401(k) assets out of the BAC plan trust, into separate accounts to restore the

14

separate account feature. [Id. at 3]. After spending millions to restore the separate account feature, it is unreasonable to expect that Defendant would risk another high-profile IRS audit, which would require Defendant to once again spend millions to restore the separate account feature.

This Court can no longer serve its harm-preventing function in regard to Plaintiffs' claim for loss of the separate account feature because that feature has been restored and it is absolutely clear that the violation cannot be reasonably expected to recur. Accordingly, assuming such a violation occurred, Plaintiffs' claim for loss of their rightful separate account feature is moot. This Court need not determine whether Defendant BoA actually violated ERISA and the IRC's requirement of a separate account feature because a finding of such a violation would only lead to the same conclusion: Plaintiffs' claim for violation of the separate account feature requirement is moot.

**B.      Plaintiffs lack Article III standing because they have no further injury allowing them to pursue the equitable, monetary relief they seek.**

Defendant BoA argues Plaintiffs lack Article III standing to seek equitable monetary relief because any claim they may have for loss of the separate account feature is moot. In response, Plaintiffs argue that they have Article III standing because many class members still suffer a redressable injury insofar as they have not received their allocable share of the spread Defendant earned on their 401(k) assets. As was the case above, here the only issue is a legal one—namely, whether Plaintiffs suffer any injury aside from their moot claim for loss of the separate account feature.

Retirement plan participants asserting ERISA claims must have Article III standing. *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013). This requirement is distinct from the requirement of statutory standing under ERISA. *Id.* at 338. Thus, according to the Fourth Circuit,

15

the right to enforce legal rights vesting in plan participants under ERISA, by itself, is not a basis for Article III standing. *See id.* Such a theory of Article III standing "is a non-starter as it conflates statutory standing with constitutional standing." *Id.* Therefore, even where statutory standing is met, the plaintiff still bears the burden of establishing the "irreducible minimum requirements" of Article III standing, which are as follows:

> "(1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a " 'fairly ... trace[able]' " connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is " 'likely' " and not "merely 'speculative' " that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 273-74 (2008).

In the context of claims for equitable monetary relief under ERISA, the Second Circuit echoed *David's* requirement of Article III standing *in addition to* statutory standing: "Obtaining restitution or disgorgement under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by demonstrating individual loss, to wit, that they have suffered an injury-in-fact." *Kendall v. Employees Ret. Plan of Avon. Prods.*, 561 F.3d 112 (2009). The Third Circuit also held that a showing of individual loss was required when the plaintiff sought restitution and disgorgement under ERISA. *See Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 456 (2003).

Aside from the moot claim for violation of ERISA and the IRC's separate account feature requirement, Plaintiffs plead three other claims allegedly entitling them to equitable monetary relief under count four. The first claim is as follows:

> 108. PwC and the Company (to the extent it was not at some relevant point in time acting in a fiduciary capacity) knowingly participated in all the violations described above. Accordingly, pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), both of these Defendants are liable to, among other things, disgorge any benefit they enjoyed which resulted from such violations. [FAC].

16

Applying the foregoing, at a minimum, Plaintiffs must demonstrate that they suffer an invasion of a legally protected interest in order to have standing to pursue relief in the form of Defendant BoA's disgorgement of the spread. Plaintiffs argue that they still suffer an invasion of a legally protected interest because the restoration of the separate account feature did not cause them to receive their ERISA-protected benefit of their allocable share of the spread Defendant earned on their 401(k) assets. [Doc. No. 308 at 7].

As noted above, neither ERISA, nor the IRC, nor IRS communicatiosn provide Plaintiffs any legal basis that entitles them to the spread Defendant BoA earned on their 401(k) assets. And, the terms of the BAC plan never stated that participants were entitled to the spread Defendant earned on their 401(k) assets. Rather, the BAC plan disclosures clearly stated that Defendant would retain such earnings to "save the company money." [Doc. No. 294-8 at 3]. Accordingly, Defendant's retention of this spread cannot constitute an invasion of Plaintiffs' legally protected interests.

Additionally, Plaintiffs' benefits are not less today than if the transfers never occurred. Plaintiffs' hypothetical return rates were based on the actual return rates of the 401(k) investment options they selected. Thus, the investment gains would have been exactly the same if Plaintiffs' 401(k) assets were actually invested in the options they selected. However, this is only half the story because Plaintiffs' benefits are *greater* today than they would have been if the transfers never occurred. If Defendant BoA had actually invested Plaintiffs' 401(k) assets the options Plaintiffs chose, Plaintiffs' assets would have also suffered the losses that those options experienced, reducing their final benefit payments. But, thanks to the BAC plan guarantee, Plaintiffs' assets suffered no investment losses.

Also, the BAC plan went beyond merely insuring against investment loss. Thanks to the 2009 recalculations, Plaintiffs were guaranteed a positive, minimum return rate of return, whether they received payment before or after January 1, 2007. Thus, Plaintiffs are in an undeniably *better* state than they would have been had the transfers never occurred. Thus, aside from their moot claim for loss of the separate account feature, Plaintiffs have not suffered any additional injury that would entitle them to the spread Defendant earned on their 401(k) assets. Accordingly, Plaintiffs lack standing to bring this claim.

Plaintiffs make another claim to equitable monetary relief under count four on a theory of unjust enrichment:

> 109. As a result of the violations described in this Count, Plaintiffs and other members of the proposed Cutback Class became (or will become) entitled to benefits under the terms of the Plans that are less than the benefits they would have accrued had the Plans complied with ERISA and Internal Revenue Code standards. Defendants, including but not limited to the Bank, the Pension Plan, and PwC, also were unjustly enriched. [FAC].

This claim mistakes gain for loss. For, if the BAC Plan had complied with ERISA and the IRC, the 401(k) transfers would have never occurred. If the transfers had never occurred, Plaintiffs' 401(k) assets would have actually been invested in the options selected by Plaintiffs with no protection against investment loss—little less a guaranteed, positive return. Thanks to the BAC plan guarantees, Plaintiffs are entitled to *greater* benefits than they would have been without the transfers. Accordingly, Plaintiffs have suffered no injury aside from the mooted, alleged violation of ERISA and the IRC's required separate account feature, and therefore lack standing to bring this claim.

Plaintiffs' remaining claim to equitable monetary relief under count four reads as follows:

> 107. The Plans' fiduciaries also breached their fiduciary duties, and engaged in prohibited transactions, in connection with the transactions described in this Count in violation of ERISA…Although the asset transfers were purportedly

18

authorized by means of one or more Plan amendments, the Plans' fiduciaries had a duty to ignore the terms of the amendments to the extent the amendments were inconsistent with ERISA…The Plans' fiduciaries also had a duty to communicate with participants, the Trustee and other Defendant fiduciaries honestly, and to otherwise act with the best interests of participants in mind, which they failed to do. [FAC].

Plaintiffs must demonstrate that they suffered some injury as a result of such alleged fiduciary breaches to have standing to pursue equitable relief with this claim. But, aside from Defendant BoA's alleged violation of their ERISA-protected separate account feature, Plaintiffs cannot identify any invasion of a legally protected interest caused by the fiduciaries' alleged breaches. As noted, as a result of such alleged breaches (authorizing the transfers) Plaintiffs are now entitled to *greater* benefits than they would have been but for the transfers—not less. Accordingly, Plaintiffs lack standing to bring this claim.

**C.      Remaining arguments in Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment need not be addressed.**

Since Plaintiffs lack standing to bring their fiduciary claim, there is no need to address the consent defense raised in Defendant's Motion for Summary Judgment. Further, because a lack of standing disqualifies a case for federal-court adjudication, the Court need not reach any other arguments in Defendant's Motion. Treatment of Plaintiffs' arguments in their Motion for Partial Summary Judgment is rendered superfluous for the same reason.

## V. CONCLUSION

Based upon the foregoing, IT IS HEREBY ORDERED that Defendant BoA's Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Partial Summary Judgment is DENIED. This case is now closed.

SO ORDERED.

Signed: August 19, 2013

*[signature]*

Graham C. Mullen
United States District Judge