# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:05-CV-00238-GCM

| | |
|---|---|
| DAVID L. MCCORKLE <br> WILLIAM L. PENDER, <br><br> **Plaintiffs,** <br><br> v. <br><br> BANK OF AMERICA, NA <br> PRICEWATERHOUSECOOPERS LLP <br> THE BANK OF AMERICA PENSION PLAN <br> THE BANK OF AMERICA 401(K) PLAN <br> BANK OF AMERICA CORPORATION <br> THE BANK OF AMERICA TRANSFERRED SAVINGS ACCOUNT PLAN <br> BANK OF AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE, <br><br> **Defendants.** | **ORDER** |

**THIS MATTER** is before the Court on the parties' Memoranda regarding the Fourth Circuit's instructions in *Pender v. Bank of America Corp.*, 788 F.3d 354 (4th Cir. 2015). On December 3, 2015, this Court held a status conference and ordered the parties to submit briefing on this issue. (Doc. No. 336) On December 31, Defendants filed their Memorandum (Doc. No. 337), and on February 2, 2016, Plaintiffs filed their Response (Doc. No. 340). Defendants filed a Reply on February 22 (Doc. No. 342), and Plaintiffs sought leave the following day to file a Surreply (Doc. No. 343). The Court granted the Motion, and Plaintiffs made their filing. (Doc. No. 344) On February 26, Defendants sought leave to file a Response to Plaintiffs' Surreply (Doc. No. 345), which the Court again granted. Defendants filed their Response the same day (Doc. No.

346), and accordingly, this matter is now ripe for disposition. For the reasons set out in this Order, the Court finds that whether Defendants retained a profit must be determined in the aggregate. The Court will further order that a bench trial be commenced in order to resolve that issue.

## I. BACKGROUND

This matter arises out of the decision by NationsBank, a company that subsequently merged with Bank of America ("the Bank"), to allow its employees to transfer their 401(k) assets to a cash balance defined benefit plan ("the Pension Plan"). Because the decade-long procedural history in this case has been well documented elsewhere, the Court will recite only the facts relevant to the present proceeding. *See Pender v. Bank of America*, 2013 WL 4495153, No. 3:05-cv-00238-GCM (W.D.N.C. Aug. 19, 2013); *see also Pender v. Bank of Am. Corp.*, 756 F. Supp. 2d 694, 696 (W.D.N.C. 2010), *aff'd sub nom. McCorkle v. Bank of Am. Corp.*, 688 F.3d 164 (4th Cir. 2012). The sole issue before the Court is how best to implement the instructions set out by the Fourth Circuit in its opinion reversing the grant of summary judgment in favor of Defendants and directing the court to conduct an accounting for profits. *Pender*, 788 F.3d at 370.

In its most recent opinion directed at an issue in this case, the Fourth Circuit considered whether the transfer of Plaintiffs' assets from a traditional 401(k) Plan to the Pension Plan entitled them to any monetary remedy. The critical question was whether or not the following difference between the two Plans violated ERISA:

> [Under] [t]he 401(k) Plan[,] participants' accounts reflected the *actual* gains and losses of their investment options. In other words, the money that 401(k) Plan participants directed to be invested in particular investment options was actually invested in those investment options, and 401(k) Plan participants' accounts reflected the investment options' net performance.
>
> By contrast, Pension Plan participants' accounts reflected the *hypothetical* gains and losses of their investment options. Although Pension Plan participants selected

> investment options, this investment was purely notional. . . . Instead, the Bank invested Pension Plan assets in investments of its choosing, periodically crediting each Pension Plan participant's account with the greater of (1) the hypothetical performance of the participant's selected investment option, or (2) the Transfer Guarantee.

*Pender*, 788 F.3d at 358-59 (footnote omitted) (emphasis in original).

The Fourth Circuit held that the transfers eliminated the separate account feature, which guarantees that participants funds are credited "with the actual gains and losses 'generated by funds contributed on the participant[s'] behalf.'" *Id.* at 360 (alteration in original). The court also held that the separate account feature constituted an "accrued benefit" which the Bank was forbidden from decreasing by a Plan amendment under ERISA. *Id.* at 363-64 (citing ERISA § 204(g)(1)).

Although it is undisputed that the separate account feature has since been restored, Plaintiffs argued that the temporary elimination of the separate account feature entitled them to monetary relief under one of three theories. First, they suggested that they were owed additional benefits pursuant to the terms of their Plans, under ERISA § 502(a)(1)(B), which allows suits "by a participant or a beneficiary to recover benefits due to him under the terms of his plan" and "to enforce his rights under the terms of the plan." *Pender*, 788 F.3d at 361 (emphasis omitted). Second, they claimed they were entitled to damages for breach of fiduciary duty, under ERISA § 502(a)(2). *Pender*, 788 F.3d at 362. Finally, they argued that, if Defendants had "profited" from the temporary elimination of their separate account features, that they could recover those funds under ERISA § 502(a)(3),which provides that "a plan beneficiary may obtain 'appropriate equitable relief' to redress 'any act or practice which violates'" certain ERISA provisions. *Pender*, 788 F.3d at 363.

The Fourth Circuit began by holding that the plain terms of the Pension Plan did *not* provide that Plaintiffs were entitled to additional benefits beyond what the Bank had already paid

them. *Pender*, 788 F.3d at 361. The court next held that Plaintiffs, as a matter of law, could not sustain a claim for breach of fiduciary duty. *Id.* at 363. Accordingly, the panel turned to the only remaining avenue for relief, ERISA § 502(a)(3), which provides that "a plan beneficiary may obtain 'appropriate equitable relief'" to correct certain ERISA violations. *Pender*, 788 F.3d at 363.

The court found that Plaintiffs were entitled to relief under § 502(a)(3). *Id.* at 363. Again, by eliminating the separate account feature, the Bank had violated ERISA. *Pender*, 788 F.3d at 363-64 (citing ERISA § 204(g)(1)). Consequently, the only remaining question was whether Plaintiffs sought relief that was equitable in nature. *See id.* at 364. The court found that the requested remedy—which it described as "[a]n accounting for profits"—constituted equitable relief. *Id.* at 364. The court explained that an accounting for profits is "a restitutionary remedy based upon avoiding unjust enrichment," which "holds the defendant liable for his profits, not for damages." *Id.* at 364-65. Because this type of relief is quintessentially equitable, Plaintiffs could proceed with their claims under § 502(a)(3). *Id.* at 367.

Next, the Court addressed Defendants' argument that the case was moot because they had restored the separate account features of Plaintiffs' accounts and because Plaintiffs had suffered no monetary harm as a result of the temporary elimination.[1] *Id.*; *see also id.* at 366 ("Requiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss. We reject that notion."). The panel explained, in a paragraph that the Court considers particularly instructive:

> The Bank rightly notes that its closing agreement with the IRS restored Plaintiffs' separate account feature. That restoration, however, did not moot the case. *Plaintiffs contend that the Bank retained a profit, even after it restored the separate*

---

[1] In May 2008, the Bank and the IRS entered into a closing agreement, under which the Bank transferred the assets in the Pension Plan to a special-purpose 401(k) plan, made additional payments to eligible participants whose hypothetical investments had a low rate of return, and paid a $10 million fine to the IRS. *Pender*, 788 F.3d at 360.

> *account feature to Plaintiffs and paid a $10 million fine to the IRS. Defendants do not rebut this argument, noting only that there has been no discovery to this effect. If an accounting ultimately shows that the Bank retained no profit, the case may well then become moot.*

*Id.* at 368 (emphasis added).[2]

After addressing other issues that do not influence the present proceeding, the Fourth Circuit vacated this Court's grant of summary judgment and remanded for further proceedings without additional instructions on how the required accounting for profits should be calculated. *See id.* at 370.

## II. ANALYSIS

Defendants argue that the Fourth Circuit instructed this Court to determine whether, after the Bank had restored the separate account feature, made additional payments to Plan participants, and paid a $10 million fine to the IRS, it still retained additional profits. (Doc. No. 337, 342) Plaintiffs, by contrast, argue that the Court must calculate, as to each individual Plan participant, whether the Bank earned any profit using their specific assets. (Doc. No. 340, 344) This method of calculating profits would consider the Plan's overall rate of return during the months between the transfer date and each individual's retirement. Plaintiffs urge that the Bank owes certain class members, whose assets earned more than they have received from the Bank to date, are owed the difference between prior payments (in the form of benefits plus any additional IRS settlement amounts) and what their assets in fact generated during the period in which they

---

[2] Indeed, it does seem as though Plaintiffs argued, at least in part, that Defendants retained a profit after the separate account feature was restored and the settlement payments fully allocated. (*See* Br. for Appellant at 54-55, *Pender*, 788 F.3d 354 (4th Cir. 2015) (No. 14-9011) ("The Bank generated $110 million-plus of gains (net of losses) investing participants' retirement savings. Plaintiffs are not asking the Court to punish Defendants or force the Bank to increase benefits . . . . If the 'spread' is allocated to participants' accounts and then distributed as pension benefits, participants will be made whole -- and the Bank will be no worse-off than had it never implemented its illegal arbitrage strategy in the first place."); *cf.* Plaintiffs' Memorandum in Support of Class Certification at 9, Doc. No. 171 ("[T]he relief sought would be applied in a uniform fashion, to all participants and the 401(k) Plan as a whole, across-the-board without regard to the participants' individual circumstances or differences."))

were held by the Bank. Having reviewed the Fourth Circuit's operative opinion, the sources cited therein, and the briefing submitted by the parties, the Court finds that the calculation proposed by the Bank is consistent with the Court of Appeals' instructions.

**A. The Fourth Circuit's instructions appear to contemplate calculation in the aggregate**

The Fourth Circuit's opinion in *Pender* appears to instruct this Court to determine whether, after the separate account features were restored to Plaintiffs' accounts, the Bank nevertheless retained a profit. Most importantly, the panel explained the posture of the case in the following terms: "Plaintiffs contend that the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS." *Id.* at 368. The court further counseled that "[i]f an accounting ultimately shows that the Bank retained no profit, the case may well then become moot." *Id.* This language suggests that this Court's should examine the Bank's position after the separate account feature was restored and the settlement-mandated payments and fine were disbursed.

Plaintiffs posit the Fourth Circuit intended to say that the case might be moot as to some individual plaintiffs, who received more in benefits and other payments than their assets actually earned over the period they were entrusted to the Bank. (Plaintiffs' Memorandum at 7-8, Doc. No. 340) However, Plaintiffs can point to nothing in the panel's language to support such an interpretation—much less anything as explicit as the sentence specifically invoking the period "*after* [the Bank] restored the separate account feature and paid a $10 million dollar fine." *Pender*, 788 F.3d at 368 (emphasis added); *see also id.* at 359 ("[I]n the aggregate and over time, [the account transfer] strategy could yield substantial gains for the Bank.").

Additionally, although Plaintiffs argue that many individual participants are entitled to additional benefits calculated by reference to their specific investment choices and retirement dates (Plaintiffs' Memorandum at 3, Doc. No. 340), it appears that the Fourth Circuit disagreed. Rather, the court found that Plaintiffs were *not* entitled to additional, individual benefits under the terms of the Plan. *Pender*, 788 F.3d at 361-62.[3] This result makes perfect sense. Not only are Courts forbidden from reforming the terms of a Plan to conform with ERISA, *see Pender*, 788 F.3d at 362 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011)), but it is also well-settled that participants in a defined benefit plan, such as the Pension Plan in this case, have no legal interest in the Plan's surplus, even when it is generated in part using their assets, *see, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440-41 (1999) ("Since a decline in the value of a [defined benefit] plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus—even if it is partially attributable to the investment growth of their contributions."); *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) ("[A] participant in a defined benefit pension plan has an interest in his fixed future payments only, not the assets of the pension fund." (citing *Hughes*, 525 U.S. at 439-40)). It would certainly be anomalous, then, to find that some members of the class here have a unique entitlement to the temporary surplus generated using their assets. The Court can find no basis for finding that a subset of the Plaintiff class is equitably entitled to this type of special treatment, particularly where all members of the class suffered the same injury—the temporary loss of their separate account feature—and received all of their promised benefits.

---

[3] Specifically, Plaintiffs argue that the *Pender* opinion must be read to hold that they have "won the right via the equitable remedy of an accounting for profits, 'to enforce the plan not as written, but as it should be enforced under ERISA.'" (Plaintiffs' Memorandum at 3, Doc. No. 340 (quoting *Pender*, 788 F.3d at 362)). To the contrary, that concept is absent from *Pender* and the quoted portion of the opinion held only that Plaintiffs had no such right under ERISA § 502(a)(1)(B).

The aggregate calculation approach is also consistent with the Fourth Circuit's directions that the Court should determine whether there has been "unjust enrichment" as a result of the Bank's elimination of the separate account feature. *Pender*, 788 F.3d at 364. "[T]he unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011); *see also Pender*, 788 F.3d at 366 (citing the same). An aggregate calculation accommodates both of these principles. It considers the net profit from Defendants' wrongful implementation of the transfer strategy, and it avoids imposing additional penalties on the Bank beyond what the equities strictly require.

Plaintiffs present the following argument in rebuttal. First, they say, this Court must begin with the proposition that the Bank engaged in "60,000 separate and distinct actual agreements with each Participant who elected to make a transfer." (Plaintiffs' Memorandum at 26, Doc. No. 340) Next, the Court must examine the profits or losses derived from each separate transaction. (*Id.*) Whether at the end of all the implicated transactions, the Bank had no profits is irrelevant, Plaintiffs argue, because this simply means Defendants spent the gains they acquired using some individuals' assets—a fact which is not typically permitted to offset disgorgement. (*Id.* at 22-24). In short, Plaintiffs ask the Court to define "profit" for the purposes of assessing unjust enrichment as "an immediate increase in the Pension Plan's assets." (*Id.* at 2)

The Court finds two problems with this position. First, nothing in the Fourth Circuit's opinion seems to support parsing the class in this manner.[4] Indeed, the panel appeared to agree

---

[4] Plaintiffs make repeated reference to a section of the court's opinion that uses a hypothetical example of two employees, "Jack" who participates in a traditional 401(k) plan, and "Jill" who participates in the Pension Plan, which eliminates her separate account feature. (*See, e.g.*, Plaintiff's Memorandum at 7, Doc. No. 340 ("The Bank's reading is irreconcilable, for example, with *Pender*'s discussion of Jill . . . .")) But this paragraph appears in the

with Defendants that none of the Plan participants had suffered financial injuries, *see Pender*, 788 F.3d at 366-67, which makes sense, because each has received the benefits to which he or she was entitled, *id.* at 361-62. Instead of tying the remedy to an individual entitlement to varying amounts of funds, the court seems to have ordered that Plaintiffs, who all suffered the same "invasion of a legally protected interest" when their separate account features were temporarily eliminated, be apportioned a *pro rata* share of any overall profit attributable to the Bank's corresponding ability to engage in large-scale investment of the group's assets. Indeed, contrary to Plaintiffs' assertions, the Fourth Circuit broadly held that Plaintiffs have standing to seek disgorgement of profits—and it simply did not say, in any terms, that its holding was limited to a subclass of Plan participants. (Plaintiffs' Memorandum at 3, 8 n.2, Doc. No. 340)

Second, Plaintiffs have failed to proffer a way that the Court could reconcile the individualized calculation that they propose with the Fourth Circuit's instruction that the measure of profits be offset by the $10 million fine paid to the IRS. *Pender*, 788 F.3d at 368 Plaintiffs assert that the Fourth Circuit's instruction is "dicta" that "command[s] absurd results" (Plaintiffs' Memorandum at 7, Doc. No. 340), but this Court cannot find itself so free to blatantly disregard language that seems to have the sole purpose of guiding the proceedings on remand— particularly where the Circuit's instructions are otherwise somewhat limited. In sum, the Court finds that it should calculate whether the Bank retained a profit by looking at all of the transfer accounts in the aggregate.

---

facts section of the Circuit's opinion and begins with the phrase "to illustrate by example." *Pender*, 788 F.3d at 359-60. Accordingly, the Court is persuaded that its purpose is to explain the facts of the case, and how it was possible for the Bank's transfer strategy to be profitable, rather than to influence the proceedings on remand.

### B. Plaintiffs' remaining arguments are unavailing

Plaintiffs assert several additional arguments in opposition to the Bank's proposed method of calculation. None are availing, for reasons the Court will briefly address. First, Plaintiffs argue that Defendants' calculation method violates ERISA § 3(34), because it "seeks to calculate [a participant's account] in part by reference to the investment performance of other participant[s'] contributions." (Plaintiffs' Memorandum at 15-16, Doc. No. 340) As an initial matter, this is incorrect. Defendants' method seeks to calculate a participant's account by the terms of the Plan, and to distribute any ultimate profits among all of the equally-injured class members. Moreover, Plaintiffs have proposed a calculation method that involves a similar conundrum to the one they attribute to Defendants. Plaintiffs ask this Court to consolidate all of the Plan participants assets for the purposes of calculating the rate of return attributable to each individual's assets for the period those assets were entrusted to the Bank. In fact they must, because there appears to be no other way to approximate individual assets' rate of return. (*See* Defendants' Memorandum at 3 ("During the time that the transferred assets were in the Pension Plan, they were not tracked on an individual participant-by-participant basis.")) Yet for purposes of determining whether the Bank profited, Plaintiffs resist attempts to aggregate all of the Plan participants' assets. It appears to the Court, then, that Plaintiffs favor cumulative assessment of all participants' assets when it is convenient for them, but not when it has the potential to preclude recovery from the Bank.

Plaintiffs also argue that conducting the Bank's proffered calculation would violate ERISA § 204(g), which provides that that "an ERISA-plan participant's 'accrued benefit' 'may not be decreased by an amendment of the plan' unless specifically provided for in ERISA or regulations promulgated pursuant to ERISA." *See Pender*, 788 F.3d at 361. Plaintiffs suggest

that the Bank has somehow taken benefits owed to some class members and used them to pay benefits owed to others. Again, this misses the mark. Plaintiffs have already received all of the benefits to which they were entitled. *Pender*, 788 F.3d at 361-62. This means that the Bank's proposed method of calculation does not, to use Plaintiffs' analogy, "cut back McCorkle's benefit to help defray the cost of John's benefit." (Plaintiffs' Memorandum at 17, Doc. No. 340) Instead, both McCorkle and John have already received the benefits they are owed, and the question is whether the Bank nevertheless derived profits from its overall transfer strategy that ought to equitably be disgorged and distributed among McCorkle, John, and the other members of the class.[5]

Finally, Plaintiffs suggest that the Bank's method of calculation ignores the *Pender* court's statement that a plaintiff need not identify a particular *res* still in the defendant's possession in order to recover under an accounting for profits theory. (Plaintiffs' Memorandum at 18-19 (citing *Pender*, 788 F.3d at 364)). However, it is readily apparent from the context of the cited statement that the panel was merely distinguishing an accounting for profits from a constructive trust, rather than setting out the proper means of determining whether the Bank, as a result of its investment strategy, was unjustly enriched. *See Pender*, 788 F.3d at 364 ("[An accounting for profits] is akin to a constructive trust, but lacks the requirement that plaintiffs 'identify a particular *res* containing the profits sought to be recovered.'" (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 n. 2 (2002)). And in any event, there is no indication that the Bank's calculation would require this Court to determine whether the Bank

---

[5] Plaintiffs' argument that the Bank's calculation violates the Plan document fails for the same reason, as does its argument that payments to other participants cannot be characterized as "losses." (*See* Plaintiffs' Memorandum at 17-18 (arguing that "the Plan document bars the Bank's attempt to charge Jill for John's benefit"); *id.* at 20 ("What the Bank suggests here is that if a plan's investment earnings are not sufficient to cover the cost of the benefits promised to A . . ., that constitutes a 'loss' which can be used to justify a reduction in the benefit owed to participant B . . . .")).

retained any profits attributable to any one participant's enrollment in the Plan. Nor does it ask the Court to determine whether any profits remain today that are attributable to the scheme, which ended in 2008. Indeed, such requirements would undoubtedly go against the Fourth Circuit instructions. Thus, Plaintiffs' additional arguments do not undermine this Court's conclusion that the proper inquiry in light of the Fourth Circuit's instructions in *Pender* is whether "the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS." 788 F.3d at 368.

### III. CONCLUSION

For the foregoing reasons, the Court finds that its analysis of whether or not the Bank retained a profit must be conducted in the aggregate.[6] The Court will hold a bench trial on the issue of whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited from its transfer strategy. At that time, the parties may present any evidence, including expert testimony, relevant to that determination.

### IV. ORDER

**IT IS THEREFORE ORDERED THAT** the court will conduct a bench trial. IN ACCORDANCE WITH the Local Rules of the Western District of North Carolina and pursuant to Rule 16 of the Federal Rules of Civil Procedure, the undersigned enters the following Pretrial Order and Case Management Plan in this matter. **Note that this Order incorporates certain proposed changes to Rule 16 of the Federal Rules of Civil Procedure (See Section II.D.)**

---

[6] Defendants argue that there is a disputed issue of whether the Bank's profits should be determined by reference to the transferred assets or the Pension Plan Trust as a whole. (Plaintiffs' Reply at 16-17, Doc. No. 342) Because this issue has not been substantially briefed, the Court will consider it at trial.

## I. DISCOVERY

A. DISCOVERY GUIDELINES: The parties are instructed to retain no more than two (2) experts apiece. After those experts have prepared reports, each party will disclose both the reports and the documents or other materials that the experts relied on in forming an opinion to the other party. The only discovery that is permitted at this time is the exchange of this material and expert depositions. The parties will have thirty days from Defendants' submission of expert reports to make their experts available for depositions at a mutually convenient time. Reports from retained experts under Rule 26(a)(2) will be due:
    from Defendants by **April 18, 2016;** and
    from Plaintiffs by **May 17, 2016.**

B. THE MAINTENANCE OF DISCOVERY MATERIALS: Discovery materials are NOT to be filed. All counsel are advised to consult local rule 26.1 which provides that while depositions must still be served on all parties, they are no longer to be filed unless upon order of the Court. The parties are responsible for the preservation of any and all discovery materials they may generate.

C. VIDEO DEPOSITIONS: Video depositions will not be permitted. The Court will consider only live testimony from the parties' experts.

D. DISCOVERY COMPLETION: All discovery shall be completed by **July 18, 2016.** Counsel are directed to subpoena depositions sufficiently in advance of the discovery completion deadline so as to comply with this Order. Discovery requests that schedule depositions after the discovery completion deadline are not enforceable except by order of the court for good cause shown. The parties may consent to extensions of the discovery completion deadline so long as any such extension expires not later than ten (10) days prior to scheduled trial time.

## II. MOTIONS

A. MOTIONS DEADLINE: Any motion regarding a discovery matter should be filed as soon as possible.

B. MOTIONS: When filing motions, counsel should comply with Local Rule 7.1.

C. MOTIONS HEARINGS: Hearings on motions ordinarily will be conducted only when the Rules require a hearing, or when the court determines that a hearing will assist the court. All motions requiring a hearing will be heard as soon as is practical. The Clerk will notify all parties as far in advance as possible of the date and time set for the hearing.

D. Prior to the filing of any motion relating to discovery, the movant must request a conference with the Court. This conference may be held telephonically or in chambers.

## III. TRIAL

The trial is scheduled for the **November 7, 2016** term and is expected to take **2-3 days**.

## IV. TRIAL PROCEDURES

A. COUNSEL'S FILINGS SIX WEEKS BEFORE TRIAL: **Six full weeks before the trial,** counsel for each party shall file with the Court:

    (a) Memoranda to the Court stating their positions;

    (b) Proposed Findings of Fact and Conclusions of Law;

The deadline indicated on the published trial calendar may not be extended for any reason. **Failure to comply with this deadline WILL result in sanctions.**

B. COUNSEL'S FILINGS TWO WEEKS BEFORE TRIAL: **Two full weeks before the trial**, counsel for each party shall file:

    (a) A statement of the education, experience, and qualifications of each expert witness, unless the parties have stipulated to the qualifications of each expert witness;

    (b) Stipulations concerning the authenticity of as many proposed exhibits as possible; and

    (c) An exhibit list.

Four (4) courtesy copies of the above are to be provided to the courtroom deputy.

C. FORMAT FOR EXHIBIT LIST: In preparing the exhibit list, counsel separately shall identify and number each exhibit, shall arrange the list numerically by exhibit number, and shall place the following headings on the exhibit list:

| Exhibit # | Description | Identified by | Admitted |
| --- | --- | --- | --- |

It is not necessary for counsel to make entries in either the "Identified by" column or the "Admitted" column. Counsel shall also provide an electronic copy of the exhibit list with the electronic exhibit files.

## VI. SANCTIONS

Failure to comply with any of the provisions of this Order which causes added delay or expense to the Court may result in the imposition of sanctions.

**IT IS SO ORDERED.**

Signed: March 10, 2016

Graham C. Mullen
United States District Judge