**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:05-CV-00238-GCM**

| | | |
|---|---|---|
| WILLIAM L. PENDER, ET AL., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **AMENDED ORDER** |
| | ) | |
| BANK OF AMERICA CORP., ET AL., | ) | |
| | ) | |
| **Defendant.** | ) | |
| | __) | |

**THIS MATTER** is before the Court following a bench trial held November 7, 2016 – November 14, 2016. After hearing the evidence presented at trial and reviewing both parties' Proposed Findings of Fact and Conclusions of Law (Docs. Nos. 355, 356) the Court finds in favor of the Defendant, Bank of America Corp. et al, on all issues for the reasons set forth below.

**I.      Overview of the Case**

This matter arises out of the decision by NationsBank, a company that subsequently merged with Bank of America ("the Bank"), to allow its employees to transfer their 401(k) assets to a cash balance defined benefit plan ("the Pension Plan"). Because the decade-long procedural history in this case has been well documented elsewhere, the Court will recite only the facts relevant to the present proceeding. *See Pender v. Bank of America*, 2013 WL 4495153, No. 3:05- cv-00238-GCM (W.D.N.C. Aug. 19, 2013); *see also Pender v. Bank of Am. Corp.*, 756 F. Supp. 2d 694, 696 (W.D.N.C. 2010), *aff'd sub nom. McCorkle v. Bank of Am. Corp.*, 688 F.3d 164 (4th Cir. 2012).

The Fourth Circuit described the Pension Plan as follows:

[Under] [t]he 401(k) Plan[,] participants' accounts reflected the *actual* gains and losses of their investment options.  In other words, the money that 401(k) Plan participants directed to be invested in particular investment options was actually invested in those investment options, and 401(k) Plan participants' accounts reflected the investment options' net performance.

By contrast, Pension Plan participants' accounts reflected the *hypothetical* gains and losses of their investment options.  Although Pension Plan participants selected investment options, this investment was purely notional . . . . Instead, the Bank invested Pension Plan assets in investments of its choosing, periodically crediting each Pension Plan participant's account with the greater of (1) the hypothetical performance of the participant's selected investment option, or (2) the Transfer Guarantee.

*Pender v. Bank of America Corp.*, 788 F.3d 354, 358–359 (4th Cir. 2015) (footnote omitted)

(emphasis in original).

## A.  IRS Involvement

Following the appearance of a *Wall Street Journal* article covering the BAC transfers, the

IRS opened its audit of the Bank's retirement plans on or about July 20, 2000.  During the audit,

the Bank and the IRS engaged in a series of correspondences regarding the Internal Revenue

Code's ("IRC") requirement of a separate account feature for any employee 401(k) plan assets

that are transferred into a defined benefit plan such as the BAC plan.  In these correspondences,

the Bank's position was that the separate account feature was not violated if a defined benefit

plan such as the BAC plan provided a benefit not less than the transferred 401(k) plan benefits,

adjusted at a 'going rate' for periods after the transfer.  (Doc. No. 295-29 at 1-2).

On December 9, 2005, the IRS issued its Liability Technical Advice Memorandum

("TAM"), which concluded that the transfers of participants' 401(k) assets into the BAC plan

resulted in a loss of the separate account feature required for defined contribution plans.  (Doc.

No. 295-5 at 26).  The IRS reasoned that, "to preserve the separate account feature, the separate

defined contribution account must be determined by the investment experience of the

contributions made on the participant's behalf." (Doc. No. 295-5 at 25). Thus, according to the IRS, the BAC plan's hypothetical investment credits failed to preserve the separate account feature.

In *ex parte* settlement negotiations concerning this alleged violation3 the IRS submitted that, in order to restore the separate account feature, the Bank should pay participants the greater of (a) the original TSA amount plus BAC trust earnings (actual earnings) or (b) the hypothetical TSA account balance. (Doc. No. 295-12 at 1). The Bank disagreed with this restoration method and instead proposed its "Rescission Plus" method. [See Doc. No. 295-35 at 4]. By this method: (1) the hypothetical balance of participants' TSAs would be transferred out of the BAC trust and into individual 401(k) plan accounts; (2) the balance of the TSA would be maintained as a sub-account within participants' 401(k) plan accounts; (3) the restored funds would actually be invested at the direction of the individual participants; (4) the balance guarantee in the BAC plan would be maintained to ensure that no participant received less than his initial TSA balance in the course of shifting the 401(k) assets out of the BAC trust, into individual accounts; and (5) a minimum rate of return would be guaranteed to BAC plan participants. (Doc. No. 295-7 at 7-10).

Within a few days following a July 20, 2007 settlement meeting between the Bank and the IRS, the parties reached an agreement to settle the ongoing audit. The determination letters the IRS issued in connection with the Closing Agreement stated that they related only to the status of the Bank plans under the IRC and did not amount to a determination regarding the application of other federal statutes. (Doc. No. 295-8). Under the settlement, the Bank paid 10 million dollars to the U.S. Treasury and spent approximately 10 million dollars applying its Rescission Plus method to shift participants' 401(k) assets out of the commingled trust, back into separate accounts. (Doc. No. 295-7 at 3, 9).

## B. BAC Benefit Recalculations

Per the Closing Agreement with the IRS, the Bank established a new special purpose defined contribution plan. Effective April 15, 2009, for participants who still had TSA accounts under the BAC plan, the Bank implemented steps to transfer BAC participants' TSA account balances out of the BAC plan, into individual accounts in the name of each participant. (Doc. No. 295-7 at 7-10). The transferred TSA balance reflected a participant's originally transferred 401(k) balance plus hypothetical investment credits to date. After this transfer from the BAC plan occurred, a participant's TSA assets would actually be invested in the options a participant chose and would receive investment credits based on the actual performance of those options. (*Id.*).

In addition to delivering on its guarantee against investment loss under the BAC plan, the Bank amended its BAC plan to guarantee a minimum rate of return on transferred 401(k) assets that were invested in the BAC plan. For participants who had not received their benefit payment before January 1, 2007, this minimum rate of return was 11.6%. According to the Bank, 11.6% represented the difference between (a) the rate of return the Bank earned by investing participants' 401(k) assets in the BAC trust between July 1, 1998 and December 31, 2006 and (b) the average hypothetical return earned by participants during the same period. (*Id.* at 8).

The benefit calculation method for participants who received their benefit payment before January 1, 2007 was different. The guarantee against investment loss remained. But the guaranteed minimum rate of return was not 11.6%. Rather, the minimum rate of return for such a participant was calculated by (a) taking the actual return the transferred BAC assets made between the participant's original 401(k) transfer date and the date on which the participant received payment from the BAC plan and (b) comparing that actual return to the average

hypothetical return earned by all participants over the same period.  The participant's guaranteed minimum rate of return was equal to the positive difference, if any, between (a) the actual rate of return on participants' transferred 401(k) assets and (b) the average hypothetical rate of return for the period when the participant's 401(k) assets were invested in the BAC trust.  (*Id.* at 8).

### C. Fourth Circuit Remand

In its most recent opinion directed at an issue in this case, the Fourth Circuit held "that Plaintiffs have both statutory and Article III standing" and remanded this case for further proceedings.  *Pender v. Bank of America Corp.*, 788 F.3d 354, 358–359 (4th Cir. 2015).

The court first held that the Plaintiff has statutory standing to bring their claim under ERISA § 502(a)(3).  *Id* at 363.  For Section 502(a)(3) to apply to these facts, the transfers must have violated a covered ERISA provision and the Plaintiff must seek "'appropriate equitable relief' within the meaning of the statute."  *Id.* at 363.

The transfers violated a covered ERISA provision, Section 204(g)(1), because the transfers eliminated the defined contribution plan's separate account feature.  This feature "constitutes an 'accrued benefit' that 'may not be decreased by amendment of the plan'" under ERISA § 204(g)(1).  *Id.*

Consequently, the only remaining question was whether Plaintiffs sought relief that was equitable in nature.  The court found that the Plaintiffs seek the following relief, which constitutes appropriate equitable relief as used in Section 502(a)(3):

> Here, Plaintiffs seek the difference between (1) the actual investment gains the Bank realized using the assets transferred to the Pension Plan, and (2) the transferred assets' hypothetical investment performance, which the Bank has already paid Pension Plan participants.  In other words, Plaintiffs seek the profit the Bank made using their assets.  This is the hornbook definition of an accounting for profits.

*Pender*, 788 F.3d at 364.

The court explained that an accounting for profits is "a restitutionary remedy based upon avoiding unjust enrichment," which "holds the defendant liable for his profits, not for damages." *Id.* at 364–5. Because this type of relief is quintessentially equitable, Plaintiffs could proceed with their claims under § 502(a)(3). *Id.* at 367.

Next, the court went through Article III standing analysis and found that the Plaintiffs satisfied all requirements. *Id.* at 366.

In addition, the court addressed Defendants' argument that the case was moot because they had restored the separate account features of Plaintiffs' accounts and because Plaintiffs had suffered no monetary harm as a result of the temporary elimination. *Id.*; *see also id.* at 366 ("Requiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss. We reject that notion."). The panel explained:

> The Bank rightly notes that its closing agreement with the IRS restored Plaintiffs' separate account feature. That restoration, however, did not moot the case. Plaintiffs contend that the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS. Defendants do not rebut this argument, noting only that there has been no discovery to this effect. If an accounting ultimately shows that the Bank retained no profit, the case may well then become moot.

*Id.* at 368.

The Fourth Circuit vacated this Court's grant of summary judgment "based on its erroneous standing determination" and remanded for further proceedings without additional instructions on how the required accounting for profits should be calculated. *See id.* at 370.

On March 10, 2016 this Court issued an order on how best to implement the instructions set out by the Fourth Circuit: the analysis of whether or not the Bank retained a profit must be

conducted in the aggregate.  *See* Doc. 347.  The Court concluded that the Fourth Circuit decision did not call for "60,000 separate and distinct" account-by-account examinations of "the profits or losses derived from each separate transaction."  Doc. 347 at 8-9.  The Court also rejected Plaintiffs' proposal to count "gains" and not "losses," holding that there was "no basis for finding that a subset of the Plaintiff class is equitably entitled" to a temporary surplus generated using their assets, when "all members of the class suffered the same injury — the temporary loss of their separate account feature—and received all of their promised benefits."  *Id.* at 7.  The order set a bench trial to be held on the issue of whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited from its transfer strategy.  *Id.*

Each party was allowed to present two experts to testify on their behalf.  The Court carefully considered the four experts' testimony, the documents admitted into evidence, and the parties' respective Findings of Fact and Conclusions of Law.  For the reasons indicated herein the Court finds that the Defendants established that it did not retain a profit from the Pension Plan, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS.

## II.    Discussion

After holding the bench trial and reviewing the parties' arguments and relevant case law, the Court finds in favor of Bank of America Corp et al on all counts.

### A.  Defendants' Experts' Testimony was More Credible than Plaintiff's Experts' Testimony

Both the Plaintiffs and the Defendants experts have presented a coherent and facially plausible story for their parties.  The Plaintiffs' expert, Lawrence Deutsch, argues that since the

Plaintiffs' transferred assets were comingled with other assets in the Pension Plan, the transferred assets should be considered undifferentiated Plan assets. So, all investment returns on all assets in the Plan should be used to calculate the profit and the transferred funds would be assigned a pro rata share of those returns. Mr. Deutsch's calculation finds the investment gains retained by the Bank from the transferred assets are $379 million. The Plaintiffs' other expert Clark Maxam argues that the Bank must disgorge that greater of the aggregate gains the Bank still retains from the transferred accounts or the market interest the Bank hypothetically would have paid to receive a loan of the transferred assets. Dr. Maxam calculated the retained interest savings of the transferred assets to be $275 million.

The Defendants' expert Russell Wermers opines that through the use of accepted investment return benchmarks, he can assess whether the Plan's Investment Strategy could have produced a profit. Dr. Wermers found that during the transfer period equities significantly declined, while fixed income investments substantially increased. Since the Plan's Investment Strategy caused the Plan to invest more heavily in equities than the hypothetical investments made by participants, Dr. Wermers found that the transfer strategy did not result in a profit for the Bank. The Defendant's other expert, David Andreasen, argues that the returns of the Investment Strategy can be calculated by tracking the returns for each month for the Equity Hedge strategy and the overweighting equity strategy. The participants' hypothetical equity and fixed income investments were also tracked each month and Mr. Andreasen argues that whether the Pension Plan retained any profit from the transferred assets should be calculated by comparing these two values. Mr. Andreasen's calculations show a loss of $278 million as a result of the transfer assets.

The four experts' testimony are not contradicted by objective evidence and so this Court is in the position where it must make a determination to credit the testimony of either the Plaintiffs' or Defendants' experts based on the Court's understanding of and belief in what was said at trial. On that basis, the Court finds that the Defendants' experts provided evidence at trial that is more credible than the testimony provided by the Plaintiffs' experts.

## III.    Findings of Fact

Having reviewed and carefully considered the evidence and arguments presented at trial, the Court makes the following findings of fact:

### A.  Summary

1.  The core of the Plan's Investment Strategy was to invest the assets used to fund the TSAs more heavily in equities than participants invested their hypothetical accounts, on the theory that equities would be expected to outperform fixed income options over the long term. The Plan did this by matching or "hedging" participant equity investments with Plan equity investments and investing approximately 60% of participant fixed income investments in equities.

2.  In fact, the Investment Strategy failed. During the transfer period, equity markets experienced historic downturns, and the Plan's greater allocation to equity investments caused its investment returns to be significantly less than the aggregate returns credited to participant accounts. The Court finds, having observed the testimony of the witnesses, assessed their credibility, and considered the entirety of the evidence, that Defendants did not retain a profit as a result of the transfer. To the contrary, the evidence persuasively shows that the Plan experienced a net investment loss as a result of the Investment Strategy applicable to the TSAs, because it was more weighted in equities during a period when equity markets significantly underperformed fixed income investments.

3.   Defendants have provided calculations of the amount of the Plan's losses resulting from the transfer including, as set forth in more detail below, calculations based on contemporaneous records of investment returns maintained in the ordinary course of business.  Those calculations show that the Plan incurred an investment loss of approximately $149 million attributable to the transfer.

4.   In addition, Defendants paid participants approximately $108 million in Transfer Guarantee payments and made more than $21 million in payments to the IRS and to restore separate accounts in the TSA Plan as required by the Closing Agreement.  In total, Defendants' calculation of the losses attributable to the transfer exceeds $270 million.

5.   Plaintiffs have criticized various aspects of the investment loss calculations presented by Defendants' expert, Dr. Russell Wermers, and David Andreasen, a senior Vice President of the Bank responsible for Pension Plan investments.  But Plaintiffs have failed to quantify or credibly explain how their criticisms would turn a failed Investment Strategy from a loss into a profit. What matters here is whether Defendants retained a profit as a result of the transfer; the precise amount would be relevant only if the Court found that the evidence demonstrates a profit.  The Court finds the evidence does not support a conclusion that Defendants realized a profit.

6.  Plaintiffs' expert witnesses presented two alternative analyses allegedly showing a profit. Plaintiffs' expert Lawrence Deutsch opined that the Plan actually profited by more than $379 million.  Mr. Deutsch calculates profit based on all investment returns earned on all assets in the Plan—including investment returns on legacy fixed-benefit obligations that pre-date the transfer. For the reasons discussed below, the Court rejects this approach, finding it to be a less accurate and reliable means of measuring whether there was any profit retained from the transfer because it captures investment returns that the Plan would have earned even if the transfer did not occur.

In addition, as a matter of equity, the Court finds that this proposed methodology is inappropriate and inferior to calculating profit based on the actual Investment Strategy utilized with respect to the TSAs. This methodology also appears to be at odds with the type of assessment contemplated by the Fourth Circuit and the method for determining investment return "spread" that the IRS approved.

7.   In various submissions, Plaintiffs have also suggested an individual-by-individual calculation of participants' hypothetical returns, which excludes from the calculation individual participants for whom there was a negative "spread"—i.e., whose hypothetical investments outperformed the Plan, causing the Plan to incur losses. The Court has already rejected this approach as inconsistent with the Fourth Circuit's ruling. But even if it were not, the Court finds that this approach to calculating "profit" would not serve the purposes of equity here and would instead be punitive in nature, particularly given that participants have already received all benefits which they were promised.

8.   Plaintiffs' second expert, Dr. Clark Maxam, offers an entirely separate theory. Dr. Maxam opines that the Plan was unjustly enriched by the imputed "use value" of the transferred assets,

which Dr. Maxam states was $346 million.  As set forth below, Dr. Maxam's imputed use value theory is not a reliable or appropriate way of measuring "profit," particularly under the facts and circumstances of this case.  In addition, the Court finds that such a methodology would not serve the purposes of equity as compared to the method proposed by Defendants, which focuses on actual profit.  For that and other reasons, the Court does not accept the measurement of unjust enrichment based on use value.

9.   In sum, the evidence demonstrates that the Plan suffered a loss and that Plaintiffs' various analyses are flawed.  Accordingly, the Court finds that Defendants did not retain a profit as a result of the transfer.  Having found that there was no profit, the Court need not make findings regarding the other equitable defenses that Defendants have raised in this litigation (which were not the subject of this trial).[1]

### B.  The Evidence Demonstrates That There Was No Retained Profit

#### a.  The Plan's Heavy Concentration In Equities During A Time When Equities Underperformed Fixed Income Investments Compels A Finding That The Plan Experienced A Loss

10. Defendants' expert, Dr. Wermers, opined that the Plan did not retain a profit, and he presented various explanations and analyses in support of that conclusion.  The Court finds Dr. Wermers' testimony credible and his analyses to be persuasive and helpful.

11. Dr. Wermers is a Professor of Finance at the Smith School of Business at the University of Maryland and Director of the Center for Financial Policy at the University of Maryland. Dr. Wermers' expertise includes quantitative equity strategies, investment manager performance,

---

[1] As Plaintiffs advance an equitable claim, their claim is subject to equitable defenses. See Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440, 449-50 (4th Cir. 2004). If the Court found in this trial that Plaintiffs had proved a prima facie case that Defendants retained a profit, Defendants would then have an opportunity to advance their equitable defenses to Plaintiffs' claim. Such equitable defenses include, for example, laches, estoppel, and consent. See Doc. 265 at 55-56.

and measuring performance of actively managed pension plan sub-portfolios. He has taught courses on Quantitative Equity Portfolio Management, Corporate Finance Theory, Security Analysis, and Investment Theory, among other topics. He has written academic papers on pension plans that have focused on benchmarking and measuring the performance of their actively managed sub-portfolios in different asset classes, and co-authored a scientific textbook on how to measure the performance of portfolio managers. He has provided advisory services to the Quantitative Strategies group at Goldman Sachs Asset Management, as well as the Office of Financial Research of the United States Treasury Department.

12. Dr. Wermers opined that the outcome of the transfer strategy can be determined even without directly analyzing the specific hypothetical investment elections participants made and the specific investments the Plan made. Specifically, Dr. Wermers assessed whether the Plan's Investment Strategy applied to the TSAs could reasonably have produced a profit in light of the performance of accepted investment return benchmarks during the relevant period. Using the investment return benchmarks specified in the Plan's Investment Policy Statements, Dr. Wermers evaluated: the performance of the Plan's domestic equity investments by looking to the Russell 3000 Index; the performance of the Plan's international equity investments by looking to the MSCI EAFE Index; and the performance of the Plan's fixed income investments by looking to the Lehman Brothers Aggregate Bond Index.

13. Dr. Wermers observed that during the transfer period, equities experienced significant declines, while fixed income investments experienced substantial increases. Indeed, between July 1, 1998 through March 31, 2009, the difference between equities and fixed income investments was very significant. The Russell 3000 (Equity) Index *declined* 11.2%, and the

MSCI EAFE (Equity) Index *declined* 3.5%, while the Lehman Brothers Aggregate Bond Index (a fixed income index) *increased* 81.1% during the same period.[2]

14. Because the Plan's Investment Strategy intentionally caused the Plan to invest more heavily in equities than the hypothetical investments made by participants, given the relative performance of equity and fixed income investments during the transfer period, it is clear that the transfer strategy resulted in a loss to the Plan, not a profit, as Dr. Wermers testified and the Court finds.

15. Dr. Wermers further confirmed this conclusion by constructing a model based on the Plan's Investment Strategy and participant-directed accounts. The model hedged participant equity investments and invested participant fixed income investments in a 60%/40% mix of equity and fixed income investments, in accordance with the Plan's Investment Policy Statements. Dr. Wermers then used the model to test the Plan's net investment performance for every possible participant-directed allocation, from 100% equity to 100% fixed income, based on the performance of the Plan's investment benchmarks during the transfer period.

16. Using this approach, Dr. Wermers concluded that there is no participant-directed allocation that would have resulted in an aggregate investment gain for the Plan. For every possible hypothetical investment combination that participants directed, the Plan's Investment Strategy called for the Plan to invest in, at a minimum, a share of equities *equal* to participant

---

[2] Dr. Wermers explained that he selected the Russell 3000 Index because the Plan's Investment Policy Statement specifically provides that the Russell 3000 Index is to be used to benchmark the performance of the Pension Plan's allocation to U.S. equities. (D.E. 15 at 4.) Dr. Wermers further explained that using the Russell 1000 and Russell 2000 indices as Dr. Maxam has suggested would not change the outcome of his analyses, as returns on those indices also were significantly less than returns on the Lehman fixed-income index. The Russell 1000 Index declined 12.3%, and the Russell 2000 Index gained only 6.4%, compared to gains of 81.1% on the Lehman index.

hypothetical equity investments, and most often a *higher* share of equities (if participants allocated any portion of their hypothetical investments to fixed income options).

17. Because equities substantially underperformed fixed income investments during the relevant period, and because the Plan's investments were more heavily concentrated in equities than were participant-directed hypothetical investments, it is unsurprising that the Plan would have experienced a net loss.[3]

### b. The Plan's Records Show A Substantial Loss From The Transfer

18. Defendants' analysis, based on contemporaneous records that the Plan maintained in the ordinary course of business, produced calculations and estimates consistent with the conclusion that the Plan realized a loss on the transfer as a result of the underperformance of equities during the relevant period.

19. In order to track the performance of the Investment Strategy, the Plan, through its investment consultant, Callan Associates, measured returns each month separately for (a) its Equity Hedge strategy and (b) its 60/40 strategy. The Plan's investments, including investments made pursuant to the Equity Hedge strategy, were not tracked and investment returns were not measured on an individual participant-by-participant basis.

20. The Plan also tracked each month, on an aggregate basis, participants' hypothetical equity and fixed income investments. These were recorded in monthly "trial balance" documents, which

---

[3] The Court found the slides 4-6 shown during Mr. Andreasen's testimony to be particularly illustrative to the point that the Plan's Investment Strategy to overweight equity selections caused the Plan to have a net loss during the relevant time period. These were tendered as part of the court records, though not tendered into evidence.

are documents that reflect Plan liabilities, including changes in such liabilities, and which were maintained by the Plan's recordkeeper in the ordinary course of business.

21. These contemporaneous records were compiled into the Return Data Spreadsheet, which was created and admitted as a summary for this litigation. The Return Data Spreadsheet used these primary inputs to calculate the monthly and cumulative percentage returns of the Pension Plan's Investment Strategy, on the one hand, and participants' hypothetical investment performance, on the other. The Plan's net investment performance was determined by subtracting aggregate participant percentage returns (*i.e.*, liabilities) from the Plan's percentage returns attributable to the Investment Strategy (*i.e.*, assets). The net investment returns on a percentage basis were then multiplied by the aggregate balance of the TSAs each month.

22. Using the data in the Return Data Spreadsheet, the Bank—through Mr. Andreasen, with assistance from Callan Associates—calculated the cumulative totals in the Return Data Spreadsheet. This calculation shows that the Plan experienced a cumulative net investment loss on the Investment Strategy related to TSAs.

23. Beyond this investment loss, the Bank also accounted for other payments associated with the transfer. It subtracted the total amount of Transfer Guarantee payments made by the Pension Plan to participants. It subtracted the total amount of the additional Transfer Guarantee payments made by the Pension Plan to participants pursuant to the Closing Agreement. It subtracted the $10 million IRS payment pursuant to the Closing Agreement. And finally, it subtracted expenses for the restoration of separate accounts as required by the Closing Agreement. Combining these figures, the Bank's calculations showed a cumulative loss of approximately $278 million resulting from the transfer.

24. As discussed below, Plaintiffs dispute the Plan's cumulative investment loss. There is no dispute, however, as to the accuracy of the figures contained in Defendants' Exhibit 104, or that these payments were actually made. Instead, Plaintiffs argue that certain of these payments should not be considered in determining whether there was any retained profit.

25. The Court finds that the payments in Defendants' Exhibit 104, which total approximately $129 million, are properly included in assessing whether Defendants retained profit from the transfer. All of these expenditures resulted directly from the Bank's transfer strategy and would not have been incurred if the transfer had not occurred. The Court finds that it would be both inaccurate and inequitable to measure whether Defendants realized and retained a profit without considering these expenditures, all of which were required payments and direct consequences of the transfer strategy and its unwinding.

26. The Transfer Guarantee Payments were part and parcel of the transfer strategy, and were undertakings made at the time of the transfer election to induce participants to choose that option. Their payment cannot reasonably be ignored in assessing whether Defendants realized and retained a profit from the transfer strategy.

27. Defendants' payments to the IRS and to restore separate accounts under the IRS Closing Agreement were a direct result of the Bank's unwinding of the transfer, and were costs that would not have been incurred if not for the transfer. These payments must fairly be considered in an equitable assessment of the overall financial results of the transfer.

28. Plaintiffs contend that the $10 million payment to the IRS under the Closing Agreement should be ignored because the Closing Agreement provided that no Bank payment to the IRS would be considered "compensation to, or the discharge of any obligation or liability of, any employee or former employee" of the Bank. Doc. 295-7 at 4 ¶ 3b. But this provision has no

application to the equitable issue before the Court. As noted earlier, it is undisputed that Plaintiffs have received all benefits and compensation to which they are entitled, and Defendants have not argued that the payment to the IRS had any effect on the benefits owed to Plaintiffs or should be considered compensation to employees or former employees or discharges of any obligations *to those employees*. The question before the Court is not one of amounts owed to employees but whether Defendants retained any profit from the transfer that should be disgorged to Plaintiffs—not as a result of an "obligation or liability" to the employees but as an equitable matter. Payments Defendants incurred as a result of the transfer and its unwinding must be considered in that equitable determination.

### c. Plaintiffs' Criticisms Do Not Undermine The Finding That The Plan Had A Net Loss

29. Plaintiffs do not dispute that the Plan's written Investment Policy Statements directed the Plan to invest assets to fund TSAs in a higher concentration of equities than participants invested their hypothetical accounts. Nor do Plaintiffs dispute that the Plan followed this Investment Strategy. Plaintiffs also do not dispute that fixed income investments substantially outperformed equities over the transfer period.

30. These undisputed facts essentially are determinative of the inquiry whether the Plan retained a profit due to the transfer. The Plan's assets funding the TSAs were concentrated more heavily in equities than were the Plan's liabilities on the TSAs. Equities performed worse than fixed income investments. The Plan's returns on the Investment Strategy were accordingly less than participants' hypothetical returns. Having taken in less in investment returns than it was obligated to pay out to participants, and paid nearly an additional $129 million as described in FOF ¶¶ 23-28 above, the Plan would not have retained a profit from the transfer. No persuasive evidence to the contrary was presented by Plaintiffs.

31. Plaintiffs' criticisms of some of the particulars of Dr. Wermers' analysis and

Mr. Andreasen's calculations do not change the bottom line conclusion. Plaintiffs have not

shown that any errors they claim would change the conclusion of a net loss, and Plaintiffs have

made no reliable effort to quantify the actual effects of the supposed errors.

### i. Transferred Asset Liabilities/Cash Balance Liabilities

32. Plaintiffs' expert Lawrence Deutsch criticizes Mr. Andreasen's loss calculations for

assuming that participant hypothetical investment returns are the same for the TSAs as they are

for the cash balance accounts.

33. The Plan employed a single Investment Strategy for all participant-directed accounts—

including both TSAs and cash balance accounts. As explained above, that strategy was designed

to match or "hedge" participants' hypothetical investments in equities, and to employ a 60%

equity/40% fixed income asset allocation in connection with participants' hypothetical fixed

income investments. The Plan's records tracked assets and liabilities associated with all

participant-directed accounts. Specifically, the trial balances reported on hypothetical

investments for all participant-directed accounts. Similarly, the Equity Hedge and the 60/40

strategy were tracked by the Plan's investment consultant, Callan Associates, Inc.

34. The TSAs represented a substantial portion of the participant-directed accounts during the

relevant period. Participants with both TSAs and cash balance accounts were required to elect a

single set of investment allocations that applied to both accounts, and if they reallocated their

hypothetical investments the reallocation applied to both accounts.

35. Plaintiffs have not presented non-speculative evidence reliably showing that any difference

between the TSA and cash balance account investment returns is so substantial that it would

change the Plan's losses attributable from the transfer into a gain. In fact, the evidence does not support a finding that there is any difference that is so substantial.

36. Dr. Wermers testified that the Plan's concentration in equities, and the poor performance of equities during the transfer period, mean that there is no reasonable possibility that the Plan would not have suffered a loss *regardless* of the asset allocation TSA participants may have chosen. The sensitivity analyses presented by Dr. Wermers reflecting a variety of participant allocations further support his opinion that any difference between the TSA investment returns and cash balance account investment returns would not be of sufficient magnitude to change the Bank's sizeable loss into a profit. The Court finds Dr. Wermers' analysis to be persuasive. Again, what matters is not the precise amount of any loss, but *whether* there was a Plan loss as opposed to a profit.

37. In addition, the Court notes that the IRS used the same approach that Defendants propose here for calculating investment "spread" attributable to the TSAs. The IRS used the same business records Defendants use here, including records relating to the returns on the Investment Strategy and the trial balances that considered both TSA and cash balance accounts, as sufficiently reliable for its purposes. While not in and of itself determinative, this is further evidence that Defendants' calculations are sufficiently reliable. This evidence also is a more reliable measure of the investment returns on the transfer strategy than alternative measures proposed by Mr. Deutsch.

### ii. Compounding

38. Plaintiffs' expert Mr. Deutsch also criticizes Mr. Andreasen's calculation of returns attributable to the Investment Strategy on the ground that the analysis does not account for the effects of "compounding" returns while the transferred assets remained in the Plan. As

Mr. Deutsch concedes, however, "compounding" would affect the Plan's returns in both directions— compounding gains as well as losses—and Mr. Deutsch offered no opinion at trial that accounting for compounding in the Bank's analysis would cause the results to change such that the Plan would retain a profit.

39. By contrast, Dr. Wermers addressed this issue and opined that because the Plan suffered a loss, compounding would more likely exacerbate the loss, not erase it. As Dr. Wermers explained, for any month in which the Plan outperformed participants, the excess returns would be available to invest according to the Plan's 60/40 strategy—*i.e.*, the 60% equity/40% fixed income asset allocation associated with non-Equity Hedge assets. Conversely, for any month in which participants outperformed the Plan, the Plan would have a shortfall in investment returns which would have to be funded from Plan assets that would otherwise have been invested using the same 60/40 strategy (resulting in a "compounding" loss over time). Based on this analysis, Dr. Wermers opined that compounding applying the 60% equity/40% fixed income rate of return to the gain or loss each month results in an even greater loss than Mr. Andreasen presented in his calculations. The Court finds Dr. Wermers' analysis on this issue to be persuasive.

### iii. Other Criticisms of Dr. Wermers' Analysis

40. Dr. Wermers testified regarding plaintiffs' criticism that Dr. Wermers' model fails to account for participant loans and in- service adjustments. However, the monthly trial balances on which Mr. Andreasen's profit calculation is based do account for participant loans and other adjustments. Mr. Deutsch did not demonstrate in any non-speculative manner, or persuasively or reliably, that the impact of loans and adjustments would be likely to reverse the conclusion of Dr. Wermers' model that the Plan experienced a substantial loss.

41. Mr. Deutsch also criticizes Mr. Andreasen's analysis for supposedly failing to account for inflows and outflows of assets and changes in participant allocations during the relevant period. However, the monthly trial balances on which Mr. Andreasen's profit calculation is based do account for inflows and outflows and changes in participant allocations. Dr. Wermers testified that he deliberately—and expressly—omitted these considerations to simplify his model, because it was clear that the flows during the transfer period would not change losses into profits. Mr. Deutsch presented no evidence or analysis at trial that support a contrary conclusion.

42. Dr. Wermers testified that the point of his model is that, in light of equities' underperformance of fixed-income investments, there is no reasonable possibility that the Plan would *not* have suffered losses no matter how participants allocated their hypothetical investments. That applies equally to reallocations. Again, Mr. Deutsch presented no evidence or analysis that shows that this factor would produce a net gain from the Investment Strategy applied to the transfers, rather than a net loss.

### iv. Reliability Of Records

43. Plaintiffs' experts criticize Defendants' calculations on the ground that the aggregate monthly records maintained by the Plan's investment consultant and recordkeeper allegedly contain some errors and therefore are claimed to be unreliable. The Court disagrees. The records

on which Defendants' profit calculation relies were contemporaneously made and maintained in the ordinary course of business as part of the Plan's procedures to track, monitor and report on investment performance. The Plan had every incentive to maintain accurate records at the time, and the Court finds that they are sufficiently reliable for purposes of the present inquiry into the issue of whether any profit was realized and retained.

44. Mr. Deutsch opines that a participant-by-participant review is necessary to obtain greater precision and avoid the introduction of errors that may result from using the aggregate data relied on by the Plan. Prior to trial, Plaintiffs also proposed that these issues be referred to a special master to review each of more than 60,000 individual accounts, including the individual transactions for each of these participants.

45. The Court rejects the contention that analysis of all the transactions in each individual account for more than 60,000 participants is necessary to arrive at a reliable conclusion as to whether the Plan realized a gain or loss from the transfer. Going through a process of collecting and "auditing" all individual participant data would undoubtedly be a lengthy and time-consuming task because it would require individualized review of recordkeeping data for each of over 60,000 individuals, covering millions of transactions on those accounts over more than eleven years. Such an approach is unnecessary given that Defendants' approach is supported by data maintained in the ordinary course of business that already aggregates the innumerable individual transactions on participants' accounts. Indeed, this is the very reason why the Plan, in the ordinary course of its operations, tracked investment returns on participant accounts on an aggregate basis.

46. The Court also finds that Plaintiffs' proposal for a participant-by-participant review of individual account results would end up comparing apples to oranges. As discussed elsewhere,

Plaintiffs propose to aggregate the Plan's investment returns in their measure of profit on the asset side, but decline to aggregate participants' hypothetical investment returns in their measure of profit on the liability side. For this reason, what Plaintiffs propose to measure on the asset side (aggregate investment returns) does not correspond with what they propose to measure on the liability side (individual account results). By contrast, in Defendants' analysis, the measurements on both the asset side and the liability side correspond to the same thing: aggregate results for participant-directed accounts.

47. Moreover, while Plaintiffs criticize the use of aggregated data maintained in the ordinary course of business by the Plan, they themselves use such aggregated data in connection with the "total Plan return" approach they advocate, discussed further below. *See* Part. III.A.1, *infra*. Plaintiffs' claim that the aggregated data is sufficiently reliable for their purposes but not for others is not persuasive.

### v. Criticisms As A Whole

48. Considering these and Plaintiffs' remaining criticisms of the analyses presented by Defendants, the Court finds that the evidence supports the Bank's conclusion that no profit was realized or retained from the transfers. The Bank used a specific equity-weighted Investment Strategy in connection with the TSAs, and that strategy led to significant investment losses as a result of the underperformance of equities compared to fixed income investments.

### C. The Court Does Not Accept Plaintiffs' Alternative Calculations Of Profit

49. Plaintiffs' experts have not presented any profit or loss calculations which are based upon or take into account the returns of the Investment Strategy used to fund the actual liabilities associated with the transferred accounts. Instead, Plaintiffs' experts have proposed two alternative approaches to the profit calculations. The Court rejects both proposed approaches as being neither reliable nor persuasive, including for the reasons discussed herein.

### a. Mr. Deutch's Analysis Is Based On Inappropriate Measures And Inconsistent With This Court's Rulings.

50. Mr. Deutsch estimates that the Plan retained a profit of $379 million.  The Court does not accept this estimate.

### i. Total Trust Returns Are Not The Appropriate Measure Of Profits Due To The Transfer

51. Mr. Deutsch's calculations are premised on the view that profit should be determined by reference to the investment returns on *all* assets in the Plan.  According to Mr. Deutsch, this measure should be used because the Plan did not segregate the transferred assets in a separate sub-trust or in individual separate accounts.  The Court rejects this contention for multiple reasons.  As addressed in the Conclusions of Law, Mr. Deutsch's opinions on this issue are inconsistent with prior rulings of this Court and the Fourth Circuit.  In addition to these legal considerations, the Court rejects Plaintiffs' and Mr. Deutsch's claims that profit should be determined by reference to the investment returns on *all* assets in the Plan for two separate reasons:  (1) it is contrary to the weight of the evidence, and (2) this approach to measuring returns would also not serve the interests of equity in the particular circumstances here.

52. The purpose of this trial is to determine the answer to one question:  "whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited ***from its transfer strategy***."  Doc. 347 at 12 (emphasis added).  Using investment returns on all assets in the Plan does not answer that question.

53. As detailed above, the Pension Plan's assets funded a mix of liabilities, which can be divided into two major categories: (1) assets funding participant-directed accounts, and (2) assets funding legacy benefit obligations, which pre-dated the adoption of participant notional accounts in 1998

or were from other established plans that merged with Bank of America. The evidence demonstrated that Plan assets funding participant-directed accounts (which included both the TSAs and cash balance accounts) were invested according to a specific Investment Strategy that differed from the asset allocation used to fund legacy benefits.

54. In particular, only the Investment Strategy for participant-directed accounts included the Equity Hedge, which resulted in the assets funding participant-directed accounts to be concentrated much more heavily in equities than the assets used to fund legacy liabilities. The investment strategy for funding legacy benefits had no Equity Hedge, and assets were invested according to a 60% equity/40% fixed income target allocation. While assets transferred from the 401(k) Plan were not formally segregated in the Pension Plan, it is undisputed that following transfer the Plan used the Equity Hedge strategy to fund TSA liabilities and not legacy liabilities, and the investment returns on the Equity Hedge were separately tracked and measured in the Plan's ordinary course of business.

55. Mr. Deutsch opined that in his view, total Plan investment returns should be used because the transferred assets were "commingled" in one trust and not segregated from other Plan assets. But regardless whether assets were "commingled," the Investment Strategy was a separate, documented strategy used by the Plan to invest assets to fund the TSAs.

56. The Bank's profit from the transfer (if any) is best measured using the returns from the Investment Strategy that the Plan actually used to fund the TSAs. Plaintiffs' proposal to measure Plan investment returns based on all assets in the Plan would count returns on assets that funded legacy benefit obligations entirely unrelated to the transfer *and that the Plan would have earned regardless of whether the transfer occurred*.

57. In addition, Mr. Deutsch's opinion that the commingling of assets in the Plan requires the Court to measure profits by reference to total Plan investment returns is contrary to the approach taken by the IRS in the Closing Agreement. The IRS was aware that the Plan did not segregate the transferred assets and that assets were commingled in the Pension Plan, as that was the basis for its conclusion that the transfer constituted an ERISA violation because it deprived participants of the separate account feature.

58. In approving a remedy for this violation, the IRS required the Plan to calculate the investment return "spread" at the time of the audit. Despite the commingling of funds, the IRS determined that the remedy was properly calculated based on "the investment earnings or loss, as applicable, of the Pension Plan *attributable to the Investment Strategy related to the TSAs*." Doc. 295-7 at 8 (emphasis added).

59. Mr. Deutsch criticizes the calculation of returns based on the Plan's Investment Strategy, because it counts returns on assets that funded both TSAs and cash balance accounts. But using a measure of *total* Plan return on *all* assets would include a far larger amount of assets not subject to the Investment Strategy that have nothing to do with the transfer and would be even less accurate. The Court is not required to use a *less* accurate profit measure when a *more* accurate measure is available, simply because the latter may not be perfect. To the contrary, the Court is to "reach the best approximation it can under the circumstances" of what profit is attributable to the misconduct at issue. Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. g. Here, the "best approximation" of the Bank's profit from the transfer is to consider the Plan's Investment Strategy that actually applied to the transferred assets, not the total Plan returns.

60. The Court further finds that using total Plan investment returns to assess whether there was a profit from the transfer would not serve the interests of equity when compared to using the

returns of the Investment Strategy. Instead, doing so would have the effect of being a penalty, and, conversely, would create a windfall for Plaintiffs, because much of what would be captured as "profits" under such a methodology would be investment returns the Plan would have realized in any event regardless of the transfer.

61. In sum, the Court finds that total Plan returns are an inappropriate measure of profit under these circumstances. Because Mr. Deutsch's profit calculations rest on total Plan returns, the Court rejects those calculations

### ii. Plaintiffs' Proposed Participant-By-Participant Analysis, and Inclusion of Only Those For Whom There Were "Gains," Is Inconsistent With The Court's Prior Ruling And Inequitable

62. Mr. Deutsch also contends that the issue of retained profit should be calculated for each TSA participant individually. Plaintiffs also contended in pretrial proceedings that, if the Plan's investment returns exceeded an individual participant's hypothetical TSA return the gain to the Plan should be counted as retained profit. However, if a participant's TSA returns outperformed the Plan's returns, Plaintiffs argued that the loss to the Plan should be disregarded and not offset against the Plan's gains in connection with other participants.

63. The Court in its March 10, 2016 opinion and order already considered and rejected Plaintiffs' proposal to calculate the Plan's profit by considering only gains to individual participants and ignoring losses. As the Court explained, the Fourth Circuit opinion identified this Court's task on remand as being to determine whether the Bank retained a *net* profit, which would constitute unjust enrichment subject to disgorgement.

64. Yet even if this issue had not already been decided, the Court finds that that the proposal to consider only "gains" as to individual participants while ignoring "losses" is one that would not be fair or reliable, or that would serve equity. The Court's role is not to penalize the Bank or the

Plan, which would be the necessary result of accounting for only the Plan's gains while disregarding the Plan's losses, as Plaintiffs' analysis does.

### iii. Mr. Deutsch Fails To Account For Other Payments Related To The Transfer

65. Mr. Deutsch's proposed profit calculations also fail to account for other payments Defendants incurred as a result of the transfer in addition to the Plan's investment losses. Those expenditures include supplemental Transfer Guarantee payments required by the IRS Closing Agreement, Transfer Guarantee payments made after April 15, 2009, the $10 million payment to the IRS, and $11 million in expenses required under the IRS Closing Agreement for restoration of separate accounts.

66. As detailed in Paragraphs 22-27, supra, the Court finds that these payments are properly included in the determination of whether the Bank retained a profit due to the transfer strategy.

### iv. Dr. Maxam's Analysis Is Inapplicable To The Facts Of This Case And Unreliable

67. Plaintiffs offer, as an alternative measure of profits, a "use value" figure. Plaintiffs' theory, articulated by Dr. Maxam, is that the Bank realized an imputed benefit by having the "use" of participants' money during the transfer period.

68. Dr. Maxam calculated the Bank's supposed "use value" as follows. First, he assumed that, rather than transferring assets from the 401(k) Plan to the Pension Plan, the Bank had instead gone into the open market and, one month at a time, borrowed the funds it obtained from the participants (approximately $3 billion in assets). Dr. Maxam opined that a proper hypothetical interest rate for such "loans" is the one-month AA Financial Commercial Paper rates during the transfer period. He treated the hypothetical investment returns earned by TSAs as "interest payments" on the "loan." The overall use value, according to Dr. Maxam, was the "netted" interest rate (i.e., the Commercial Paper rate minus the hypothetical TSA investment return rate

for each month), multiplied by the value of the transferred assets for that month. Applying this analysis, Dr. Maxam opined that a "reasonable estimate" of the use value of the transferred assets was $346 million.

69. The Court rejects Plaintiffs' use value analysis for multiple reasons.

### 1. Plaintiffs' Use Value claim Is Inconsistent With Their Prior Positions Expressed To The Court

70. Before submission of the expert report from Dr. Maxam, Plaintiffs had not previously identified "use value" as a measure of profit in this case—and their current position is contrary to their prior statements to the Court. Plaintiffs argued to the Fourth Circuit that they sought "the difference between (1) the actual investment gains the Bank realized using the assets transferred to the Pension Plan, and (2) the transferred assets' hypothetical investment performance." *Pender*, 788 F.3d at 364 (emphasis added). This, the Fourth Circuit explained, is the definition of "the profit the Bank made using their assets." *Id.*

71. Plaintiffs repeated that argument to this Court. Plaintiffs consistently argued that profit is determined based on whether "[t]he Bank's actual investments [did or] did not exceed [a participant's] hypothetical return." Doc. 340 at 8. Plaintiffs further made clear that "[t]he Bank is liable for restitution (disgorgement) only to the [participants] in the class who were paid *less* than the *actual investment earnings* generated with their separate-account assets[.]" Doc. 343-1 at 2 (second emphasis added).

72. When the Court explicitly instructed Plaintiffs to "present their arguments in support of their proposed alternative" method of measuring profits, Doc. 336 at 1, Plaintiffs failed to identify use value as an alternative measure.

### 2. Use Value Is Not Actual Profit or Loss

73. "Use value" is not profit.  Use value is a hypothetical, imputed gain—not a real-life measure of what actually occurred.  It is not appropriate to rely on use value when, as here, the issue is whether a profit was actually realized and retained, which is a matter of actual gains and losses.

74. The Court finds that profit—not use value—is the appropriate measure here.

### 3.  Plaintiffs' Use Value Theory Is Inconsistent With The Facts Of This Case

75. Dr. Maxam's proposed "use value" measurement is also inappropriate, unreliable and unsupported by the facts and circumstances here, which do not factually or equitably support a "use value" assessment even if such an assessment were relevant.

74. First, in return for consideration, the participants authorized the transfer of assets and liabilities to the Plan and the Plan's investment of the transferred assets—and they retained the consideration they received following restoration of the separate accounts.  Those participants who earned a positive return based on their investment choices have retained those returns, and those who made investment decisions that lost money have retained the benefit of the Bank's guarantee of the principal amount transferred, increased as a result of the IRS Closing Agreement.

75. Second, Dr. Maxam's use value remedy radically transforms the parties' agreement.  The consideration provided to the participants included a guarantee against *loss*.  Dr. Maxam's use value remedy in effect guarantees them a *gain* equal to the Commercial Paper interest rate.

76. Third, participants were not deprived of the "use" of their transferred accounts.  Within the Pension Plan, participants had the ability to direct the hypothetical investment of their TSAs using the same menu of investment options as in the 401(k) Plan and to earn the identical investment returns on their hypothetical investments that they would have earned in the 401(k)

Plan.  Participants also had the ability to take withdrawals on their transferred accounts and obtained the additional benefit of the Transfer Guarantee and the ability to take loans on the transferred balance.  In short, they had the same or greater "use" of funds that they had in the 401(k) Plan.

77. Fourth, contrary to Dr. Maxam, the Bank did not have the "use" of the transferred assets. Dr. Maxam is incorrect in asserting that the 401(k) transfer was the equivalent of a "loan" to the Bank, which the Bank could "use."  In fact, the assets were transferred from one ERISA-segregated trust (the 401(k) Plan trust) to another ERISA-segregated trust (the Pension Plan trust), both of which were solely to benefit participants.[4] Accordingly, the Bank had no "use" of the funds in the Pension Plan trust.

78. Plaintiffs have also introduced no evidence that the Bank's funding of the Plan, either during or after the transfer period, was in any way deferred or reduced as a result of the transfer of 401(k) assets.  There is no evidence that the transfer reduced the amount of the Bank's borrowing, or that the Bank would have borrowed this sum if the transfer had not occurred.

### 4.  Use Value Is Not An Accurate Measure Of Unjust Enrichment

79. The Court also rejects Dr. Maxam's use value calculation as an inequitable and unreliable measure of the Plan's or the Bank's unjust enrichment.

80. Plaintiffs contend that they are entitled to the *greater* of the "use value" or profit.  In other words, even if the Plan incurred substantial investment losses in connection with the transfer,

---

[4] ERISA § 403(c)(1) ("the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.")

Plaintiffs contend that they are still entitled to disgorgement for the hypothetical "use value" of the transferred assets.

81. The Court rejects this approach.  As the Court has previously explained (quoting the Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011)), "'[t]he unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty.'" Doc. 347 at 8.

82. Awarding Plaintiffs the alleged "use value" of the transferred assets *even where the Plan incurred a loss* from the transfer would go beyond "eliminat[ing]" the Plan's "net profit," and instead would impose a penalty on the Plan, and a windfall on Plaintiffs.  Moreover, it would do so at the expense of decreasing the Plan's funding for its other existing pension obligations, despite the fact that the Plan already suffered a loss from the transfers.  Use value is accordingly an inequitable, unreliable and unfair measure of unjust enrichment.

### D. Conclusions of Law

#### a. Prior Rulings

##### i. 2015 Fourth Circuit Decision.

1. This case is before the Court on remand from the Fourth Circuit. This Court is bound by the rulings of the Fourth Circuit under the mandate rule. "The mandate rule prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest." *See Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007). As the Fourth Circuit has explained, "[t]he mandate rule is a more powerful version of the law of the case doctrine. Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is controlling as to matters within its compass. The principle that a district court may not violate the mandate of a circuit court of appeals and may not alter the law of the case so established is basic." *Id.* at 464-65 (citations and internal quotation marks omitted).

2. The Fourth Circuit held that plaintiffs' only potential avenue to relief was an equitable claim under ERISA § 502(a)(3). Specifically, the Fourth Circuit held that Plaintiffs could seek an accounting for profit under § 502(a)(3) in order to recover "the difference between (1) the actual investment gains the Bank realized using the assets transferred to the Pension Plan, and (2) the transferred assets' hypothetical investment performance, which the Bank has already paid Pension Plan participants." *Pender*, 788 F.3d at 364. The court recognized, however, that the case would be moot if the Bank had not retained a profit after the conclusion of the transfer strategy. *Id.* at 368.

#### b. Plaintiffs' Claim To An Accounting For Profit

3. "An accounting for profits 'is a restitutionary remedy based upon avoiding unjust enrichment.' 1 D. Dobbs, Law of Remedies § 4.3(5), p. 608 (2d ed. 1993) (hereinafter Dobbs). It

requires the disgorgement of 'profits produced by property which in equity and good conscience belonged to the plaintiff.' Id."  Pender, 788 F.3d at 364.  "The profit for which the wrongdoer is liable … is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong."  Restatement (Third) of Restitution and Unjust Enrichment § 51(5) (2011), cmt. e.[5]

4.   In a claim for an accounting for profit, "the claimant has the burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's unjust enrichment.  If the claimant has done this much, the defendant is then free … to introduce evidence tending to show that the true extent of unjust enrichment is something less." Restatement § 51(5), cmt. i.  The plaintiff must produce

> a coherent theory of recovery in unjust enrichment.  The claimant's case is not merely that the defendant has committed a wrong to the claimant, but that the wrong has proximately resulted in an unjust gain to the defendant.  Allegations that the defendant is a wrongdoer, and that the defendant's business is profitable, do not state a claim in unjust enrichment.  By contrast, a claimant who is prepared to show a causal connection between defendant's wrongdoing and a measurable increase in the defendant's net assets will satisfy the burden of proof as ordinarily understood.

> *Id.*

5.   In other words, it is Plaintiffs' burden to prove "that the wrong has proximately resulted in an unjust gain to the defendant," although a "reasonable approximation" of the extent of the profit will suffice if "the evidence allows no greater precision."  *Id.* The Court "will reach the best approximation it can under the circumstances."  *Id.* § 51, cmt. g.

---

[5] All references hereinafter to the Restatement are to the Restatement (Third) of Restitution and Unjust Enrichment unless otherwise noted.

6.  Plaintiffs attempt to equate the phrase "accounting for profits" with an "audit" of each participant's account. However, that misunderstands the concept of an "accounting for profits." In the context applicable here, the term "accounting for profits" simply refers to the remedy of unjust enrichment or restitutionary "disgorgement." *Pender*, 788 F.3d at 358, 364-65; Restatement § 51(5) & cmt. a (explaining that the terms "disgorgement" and "accounting" an "accounting for profits" refer to "the same" remedial issue: "the identification and measurement of those gains to the defendant that should be regarded as unjust enrichment, in that they are properly attributable to the defendant's interference with the claimant's legally protected rights"). This use of the term "accounting" to refer to a restitutionary remedy is distinct from the concept of bringing a suit in a court of equity to obtain discovery of a defendant's financial books or to unravel a complex account, as Plaintiffs suggest. *See* 1 Dobbs, Law of Remedies § 4.3(5), at pp. 608-10 (distinguishing different uses of the term "accounting, or accounting for profits," which reflect "disparate aspects of its history," and explaining that "[i]n its most important meaning, it is a restitutionary remedy based upon avoiding unjust enrichment"); Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L. J. 463, 467-68, 476 (1985) (explaining that original use to obtain discovery is "now obsolete" and replaced by modern discovery practice).

7.  Moreover, here the initial inquiry is whether Defendants realized and retained any profit from the transfers. That question can be reliably answered without resort to a participant-by-participant, transaction-by-transaction analysis.

### c.  Legal Conclusions Related To Determination Of Profit Or Loss

8.  The proper and equitable analysis for determining whether Defendants retained a profit is to review the Plan's actual investment gains and losses attributable to the transferred assets in the

aggregate and to subtract from any net profit the $10 million IRS fine and other payments associated with the transfer.

9. The Fourth Circuit directed that the relevant question was whether "the Bank retained a profit, even after it restored the separate account feature and paid a $10 million fine to the IRS." 788 F.3d at 368. And this Court accordingly instructed that its task is to determine "whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited from its transfer strategy." Doc. 347 at 12 (footnote omitted).

10. The IRS payment and other payments described in FOF ¶¶ 23-28 above must and should, be included in the profit calculation in order to achieve an equitable outcome. These expenditures would not have been incurred if not for the transfer, they were either promised in connection with the transfer or required in connection with the restoration of separate accounts for participants, and they resulted in actual losses to the Bank and Plan. Accordingly, they must be included if the determination whether Defendants have retained any profit from the transfer is to be an accurate one, and the failure to do so would act as a penalty.

11. The Court concludes that Plaintiffs' alternative proposed profit measures are inconsistent with this analysis and would not achieve a result consistent with the equitable purposes of this proceeding.

## 1. The Court Will Not Consider Returns For The Pension Plan As A Whole

12. Plaintiffs contend that the Court should measure the Bank's profits based on the Pension Plan's investment returns on all assets—including assets funding legacy liabilities that pre-dated and had no connection to the transfer. While the Court previously reserved this issue for trial,

Doc. 347 at 12 n.6, the Court now concludes that profit should not be measured based on total Plan returns for three separate and independent reasons:

A. As a factual matter, for reasons described earlier, the Court has found that such a methodology is flawed and unreliable, and inferior to the investment measurement proposed by Defendants;

B. As an equitable matter, such a methodology would serve as a penalty and not produce equitable results; and

C. As a legal matter, the Court finds that such a methodology would be inappropriate because it would produce "profits" having nothing to do with the transfers and is therefore contrary to the purpose of this inquiry.

13. As this Court stated in its March Order, the issue is "whether the Bank, *as a result of its investment strategy*, was unjustly enriched." *Id.* at 11 (emphasis added).

14. The appropriate way to determine whether there was a profit retained "as a result of its investment strategy" applied to the transferred assets is to look at the returns attributable to that "investment strategy." Using total Plan returns, by contrast, counts returns on assets that had nothing to do with the transfer. The Plan would have earned the same investment returns on assets funding legacy benefits even if the transfer had never occurred. A measure of profits that incorporates gains from the investment of the assets used to fund legacy plan benefits is not a measure of profit *due to the transfer* and is bound to misstate any profit realized from the transfer.

15. The Court is to "reach the best approximation it can under the circumstances" of the profit attributable to the conduct at issue. Restatement § 51 cmt. g; *see also Sheldon v. Metro-Goldwyn*

*Pictures Corp.*, 309 U.S. 390, 402 (1940) (profits are properly apportioned when "the evidence is sufficient to provide a fair basis of division" between profits attributable to the misconduct and other profits); *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121 (2d Cir. 1962) ("it is the duty of the court to make some apportionment" where "the evidence suggests that some division … may be rationally used."). Here, the "best approximation" of the profit or loss on the transfer is to consider the returns from the Investment Strategy that actually applied to the transferred assets.

16. Plaintiffs also contend that the use of total Plan returns is required by the definition of a defined contribution plan in ERISA § 3(34), which requires separate accounts. This Court previously rejected this argument in its March 2016 order and it does so again. Doc. 347. The Court's task is *not* to "reconstruct" the Plan "as a defined contribution plan" under § 3(34) and pay benefits under the "reconstructed" plan. As this Court previously ruled, participants "have already received the benefits they are owed, and the question is whether the Bank nevertheless derived profits from its overall transfer strategy that ought to equitably be disgorged." *Id.* at 11.

17. Moreover, the Fourth Circuit and IRS were both aware that the transferred assets had been commingled with other Plan assets in the course of the transfer strategy. Yet both recognized that the relevant inquiry is whether there was an investment profit realized on the transferred assets, which the IRS expressly concluded must be based on the "strategy for the investment of assets attributable to the TSAs." *See* FOF ¶¶ 23, 35, 37, *supra*; Doc. 295-7 at 8.

18. Equally unsupported is Plaintiffs' assertion that total Plan returns should be considered because the Plan measured returns on all participant-directed accounts, including both TSAs and cash balance accounts.

19. The Court has found as a factual matter that the investment returns attributable to all participant-directed accounts are a fair approximation of returns attributable to the TSAs for

purposes of the inquiry here, and a more accurate and fair approximation than total Plan returns would be.

20. Moreover, the Court concludes that adopting Plaintiffs' approach would be inequitable, including for reasons set forth in these findings and conclusions. Plaintiffs' use of total Plan returns would confer an inappropriate windfall on participants, act as a penalty and otherwise be inequitable. *See, e.g., Griggs*, 237 F.3d at 385 (because potential relief under ERISA was "equitable in nature, [plaintiff] is not entitled to a windfall").

### 2. The Court Rejects "Use Value" As A Measure Of Profit

21. Plaintiffs propose "use value" as an alternative measure of profit. The Court concludes that use value is not an appropriate measure of profit for the following separate and independent reasons:

A. As a factual matter, for reasons described earlier, the Court has found that (i) Plaintiffs' "use value" methodology is flawed and unreliable as a means of measuring "profit," and inferior to the approach proposed by Defendants, and (ii) in any event, no "use value" to the Bank has been demonstrated;

B. As an equitable matter, the Court has found that Plaintiffs' "use value" methodology would serve as a penalty and not produce equitable results; and

C. As a legal matter, the Court finds that Plaintiffs' "use value" methodology would be inappropriate because (i) it is contrary to the Fourth Circuit's mandate, (ii) use value is not actual profit, and (iii) the restitutionary concept of "use value" is in any event inapplicable when (a) any "use" of the transferred assets was authorized in exchange for consideration, and (b) the participants were not deprived of the use of the funds.

D. In addition, the Court holds that Plaintiffs have forfeited any claim to use value by failing to timely raise such a suggested methodology when required to do so by the Court.

### 3. Plaintiffs' Use Value Analysis Is Inconsistent With The Fourth Circuit's Instructions

22. The Fourth Circuit remanded this case to determine whether the Bank actually retained a "profit" after it restored separate accounts, holding that if there was no profit the case would be moot. Pender, 788 F.3d at 368. The opinion makes it clear what the court meant by "profit": the "actual investment gains the Bank realized using the assets transferred to the Pension Plan." *Id.* at 364 (emphasis added).

> Plaintiffs seek the difference between (1) *the actual investment gains* the Bank *realized* using the assets transferred to the Pension Plan, and (2) the transferred assets' hypothetical investment performance, which the Bank has already paid Pension Plan participants. In other words, Plaintiffs seek the profit the Bank made using their assets. This is the hornbook definition of an accounting for profits.
>
> An accounting for profits "is a restitutionary remedy based upon avoiding unjust enrichment." It requires the disgorgement of "*profits produced* by property which in equity and good conscience belong to the plaintiff."

*Id.* (emphasis added; citation omitted).

23. Leaving no doubt about the required approach, the Fourth Circuit explained that Plaintiffs' "injury in fact" is "measured as the 'spread' or difference between the *profit the [Bank] earned by investing the retained assets* and the [amount] it paid to [them].'" *Id.* at 367 (bracketed material added by the Fourth Circuit; citation omitted). *See also id.* at 361 (describing the remedy sought by Plaintiffs as the "spread between what they were paid and the *actual investment gains* of the assets that were originally in the 401(k) Plan") (emphasis added); *id.* at 360 (referring to "the Bank's actual rate of return" and "the actual investment returns").

24. Plaintiffs' claim of use value fundamentally departs from the analysis that the Fourth Circuit ordered. Use value is merely a hypothetical, imputed benefit. Plaintiffs concede that use value is completely independent of the investment gains or losses *actually* generated with the transferred assets. Use value, therefore, is not an appropriate measure of the *actual* profit that may be subject to disgorgement.

25. Yet even if the Fourth Circuit had been silent on the matter, the Court would conclude that use value is not an appropriate measure here of profit for restitutionary purposes, particularly if the Plan otherwise suffered an actual loss from the transfers. In addition, even if it were hypothetically a permissible measure, it would be inequitable and inappropriate to treat "use value" as profit under the facts and circumstances here.

### 4. Plaintiffs' Use Value Analysis Is An Inappropriate Measure Based On The Facts Of This Case

26. Even if "use value" were permitted to be considered as a potential measure of profit, the concept does not fit the facts and circumstances established by the evidence. Use value may be an appropriate remedy when a defendant deprives a plaintiff of use of the plaintiffs' assets without authorization, and "makes unauthorized investments" of those assets. Restatement § 51(5)(b); see also id. § 53, cmt. b. ("[A] defendant is liable for the market value of the unauthorized use.") In effect, "use value" is an attempt to construct a hypothetical arms-length bargain in order to determine the amount an unconsenting plaintiff could have obtained if the defendant had not used the plaintiff's property without authorization.

27. Here, however, the parties did enter into a transaction in exchange for bargained-for consideration, making a use value analysis inappropriate.

28. The transfers here were authorized. The plan participants freely and voluntarily entered into a contractual bargain to transfer their 401(k) Plan assets to the Pension Plan.

29. The Plan participants received consideration in exchange for their informed authorization, and they have retained that consideration. Those participants who earned a positive return based on their investment choices have retained those returns. And those participants who made investment choices that reduced their transferred balance have retained the benefits of the Bank's guarantee of the principal amount transferred.

30. To be sure, Plaintiffs' consent to the transfer cannot excuse an ERISA violation. However, the Court's task is not to assess whether the transfer complied with ERISA, but to determine whether the Defendants retained a profit from the transfer that should as a matter of equity be disgorged to Plaintiffs. Plaintiffs' consent *is* relevant to determining the appropriate equitable remedy, if any. *See* Restatement § 51(5)(b) (use value is a remedy for a "conscious wrongdoer or a defaulting fiduciary who makes *unauthorized* investments of the claimant's assets") (emphasis added); *Metz v. Indep. Trust Corp.*, 994 F.2d 395 (7th Cir. 1993) (plaintiff who authorized transaction could not sue for breach of trust despite later determination that transaction violated IRS rules). The fact that the participants here authorized the transfer and retained its benefits supports the conclusion that under the equitable principles of restitution, "use value" is not a proper remedy here.

31. In addition, participants were not deprived of the "use" of their assets. To the contrary, they continued to have use of their money even after it was transferred from the 401(k) Plan to the Pension Plan. Participants' notional accounts were credited with investment returns on their hypothetical investments, participants were permitted to withdraw funds from their accounts, and, following transfer, participants could obtain tax-free loans.

32. The Bank, on the other hand, did *not* have "use" of the transferred assets. The transferred assets remained at all times in the Pension Plan, an ERISA-segregated trust maintained solely for the benefit of Plan participants. Section 403(c)(1) of ERISA provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c). Thus, the Bank could not have used these funds for any purpose other than to benefit the participants themselves.

33. Nor does Plaintiffs' "use value" theory purport to measure any savings realized by the Bank as a result of reducing its obligation to fund the Plan. Plaintiffs have not identified any *actual* use of the transferred assets that produced any *actual* cost-savings for either the Plan (whose function was to hold assets and fund benefits for the sole benefit of participants) or the Bank (which did not have any access to the transferred assets at all).

34. For all of these reasons, an analysis of the hypothetical "use value" of the transferred assets is inapposite. *See* 1 Dobbs, *Law of Remedies* § 4.5(2), p. 635-36 (2d ed. 1993) (explaining that "[u]njust enrichment does not invariably require restitution for the use value of a benefit," such as where both parties benefited from a transaction or "may intend to preclude use-value charges"). Here, the parties reached an *actual* agreement, in exchange for *actual* consideration. Having deemed the agreement unlawful, the Fourth Circuit has instructed this Court to determine whether the Bank had *actual* gains or losses as a result of the agreement. *See* FOF ¶ 37, *supra*. Plaintiffs' hypothetical use value analysis has no application here.

35. In any event, even if use value were an acceptable measure of the Bank's profit, the Court concludes in its equitable discretion that use value is inappropriate. Although Plaintiffs' consent to the transaction is not cognizable for purposes of determining an ERISA violation, that consent

is relevant to the Court's equitable analysis, as are the absence of any harm to Plaintiffs and the fact that Plaintiffs were never deprived of meaningful use of their assets. For these reasons as well, the Court rejects Plaintiffs' claim to the use value of the transferred assets.

### 5. Plaintiffs' Have Forfeited Use Value As An Available Measure Of Profit

36. Forfeiture is "'the failure to make the timely assertion of a right.'" Brickwood Contractors, Inc. v. Datanet Eng'g, Inc., 369 F.3d 385, 395 n.3 (4th Cir. 2004) (quoting United States v. Olano, 507 U.S. 725, 733 (1993)). A claim to particular relief is "forfeited if the party asserting the rule waits too long to raise the point." Kontrick v. Ryan, 540 U.S. 443, 456 (2004) (affirming holding that party forfeited argument that claim was untimely by failing to raise timeliness before the court ruled on the merits).

37. Plaintiffs here have forfeited use value as an available measure of profit because they failed to raise any claim to use value before the Court determined how the profit analysis would be undertaken.

38. In its December 3, 2015 order, the Court instructed the parties to submit briefs identifying "how the Court should conduct an accounting for profits as required by the Fourth Circuit's opinion in Pender." Doc. 336 at 1. The Court specifically instructed Plaintiffs to "respond to Defendant's method of conducting an accounting and present their arguments in support of their proposed alternative." *Id.* (emphasis added).

39. The Plaintiffs failed to identify use value as an appropriate measure of profit in the accounting for profit required by the Fourth Circuit. To the contrary, when Plaintiffs outlined their proposed methodology, they affirmatively stated that if there was no profit based on "actual investment earnings," then that would end the inquiry:

> The Bank is liable for restitution (disgorgement) **only** to the "Jills" in the class who were paid *less* than the ***actual investment earnings*** generated with their separate-account assets.

Doc. 343-1 at 2 (emphasis added). "The only way to faithfully comply with *Pender* is for the Bank to return … the net actual investment gain." Doc. 340 at 14. *See also* Doc. 341 at 2-3 ("If the Actual Account [defined as participant's "starting balance as adjusted by gains and losses generated by the assets in her account"] at cash-out was smaller tha[n] the amount paid based on the Participant's Hypothetical Account, ***the Bank did not unlawfully retain a profit*** from her account investments") (emphasis added).

40. Thus, when the Court ordered Plaintiffs to detail their proposed methodology, they not only failed to propose any "use value" theory, but they affirmatively stated that if there was no profit based on "actual investment earnings," then that would end the inquiry.

41. Having failed to raise their claim to use value when the Court instructed them to, Plaintiffs may not now inject the issue into this trial.

### d. The Court Will Not Conduct A Participant-By-Participant Analysis

42. Plaintiffs offer as an alternative measure of profits one in which the Plan's gains and losses are determined participant by participant instead of in the aggregate, and only gains are counted—with no offset for losses.

43. The Court has already considered and rejected this approach as inconsistent with the Fourth Circuit's instructions and, separately and independently, as inconsistent with the principles of equity under the facts and circumstances here. Doc. 347. Having heard the evidence at trial, the Court again concludes that such an approach would be inequitable. The issue here is not individual participant entitlements or benefits, all of which have been satisfied already. Instead, it is whether Defendants retained any additional profit that should be disgorged. What matters

for purposes of that assessment is what the Bank and the Plan realized in the aggregate, not what happened with respect to individual participants' accounts.

44. In addition, the Court separately rejects Plaintiffs' contention that, at least in the event their experts' profit estimates are not accepted, they or a special master should be granted further review of all participant-by-participant transaction records for purposes of conducting a participant-by-participant analysis and then cumulating the results in order to determine any profit. In its March 2016 Order setting the trial date and discovery schedule, this Court ordered that if any party needed additional discovery, it was to request a conference with the Court and that any motion "should be filed as soon as possible." Doc. 347 at 13. Plaintiffs could have filed a motion for additional data pursuant to this order, but they did not; nor did they make any request to the Court for appointment of a special master. Plaintiffs' requests to the Court for additional data now, after the close of the discovery period and submission of all expert reports, are untimely, and granting them would be prejudicial to Defendants and wasteful of judicial resources. Similarly, Plaintiffs' attempt to reserve the possibility of a second bite at the apple after trial through appointment of a special master is also untimely, and would be prejudicial and wasteful.

**e. Under The Appropriate Analysis, The Court Concludes That The Bank Did Not Retain Any Profit**

45. The Plaintiffs have not carried their burden as claimants of an accounting for profit to establish that any profit was retained as a result of the transfer.

46. Regardless of which party bears the burden of proof, the Court concludes that the Defendants did not retain any profit as a result of the transfer strategy.

47. Plaintiffs' claim is accordingly moot.

48. Judgment shall be entered in favor of Defendants and against all Plaintiffs.

**IT IS SO ORDERED.**


Signed: April 27, 2017

Graham C. Mullen
United States District Judge